In re SUMMIT LAND COMPANY, a Utah Corporation, Debtor.

SUMMIT LAND COMPANY, a Utah Corporation, Plaintiff,

v.

Earl ALLEN, et al., Defendants.

Bankruptcy No. 80–02538.
Civ. No. 81–0122.

United States Bankruptcy Court, D. Utah.

Aug. 18, 1981.

---

Ray G. Martineau and James C. Swindler, Martineau, Rooker, Larsen & Kimball, Salt Lake City, Utah, for debtor.

Robert F. Orton and David F. Klomp, Marsden, Orton & Liljenquist, Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION

RALPH R. MABEY, Bankruptcy Judge.

### STATEMENT OF THE ISSUES AND FACTUAL BACKGROUND

This case raises the issues whether certain land sale contracts are rejectable under 11 U.S.C. Section 365(a), and if so, whether the buyers under such contracts are "in possession" of the real estate and therefore entitled to invoke the protection of 11 U.S.C. Section 365(i).[1]

Debtor, Summit Land Company, is the developer of a recreational park consisting of 8,300 acres of mountain and range land located in northeastern Utah and known as the Eagle Ranch Preserve (the property). In November, 1977, debtor began to market "interests" (the interests) in the property. The interests are described in several instruments, the most important of which is a "Revised Declaration of Covenants, Conditions, and Restrictions for R-Ranch" (the declaration). The declaration, in effect, is a masterplan for the improvement and management of the property. It provides for the establishment of an owners association and divides responsibility between debtor and the association for superintendence during various stages of the project and for marketing of the interests. The association is organized as a nonprofit corporation and its charter, "Amended and Restated Articles of Incorporation of Eagle Ranch Preserve Owners Association" (the charter), is incorporated by reference in the declaration. Interests are sold under a "Real Estate Contract" (the contract) and in connection with a "Public Offering Statement of Summit Land Company" (the offering circular) filed pursuant to the Utah Land Sales Practices Act with the Real Estate Division of the Department of Business Regulation of the State of Utah.

Read together, these documents define the interests which are, in essence, recreational use permits. The property is a recreational park with use confined to activities such as hunting, fishing, hiking, and camping. The declaration calls for construction of some bunk houses, but these are "overnight" facilities. No structure other than a tent for camping may be erected by mem-

---

1. The parties have not raised and the court, therefore, does not reach the question whether the real estate contracts are executory contracts within the meaning of 11 U.S.C. Section 365.

bers. Only the association's manager, who need not buy an interest or be a member, has permanent residence on the property. This residence is because of his managerial rather than his membership status. Indeed, the file suggests that most members live along the Wasatch front and are therefore geographically removed from the property. Outings to the property are thus intermittent, on vacations and weekends.

Interests require shared use. They have, according to the declaration, a "perpetual and non-exclusive right and easement of use and enjoyment in and to the [property]." [2] This is necessary to facilitate the recreational concept. It is also essential to the marketing program, since debtor is authorized to sponsor rodeos, queen contests, and other events on the property as part of its sales campaign.

Interests are delegable. They may be purchased by business organizations, such as corporations or partnerships, hypothecated, divided, and resold. In all such instances, however, only one membership accompanies each interest, with the owner or owners of an interest empowered to designate some third party as the member. Thus, ownership is not necessarily coincidental with membership and use of the land.

Debtor, in the first blush of promotion, intended to sell 1,950 interests. After several years resulting in fewer than 200 sales, however, the project ran aground. See Klomp Affidavit dated May 27, 1981 ¶ 4. Creditors commenced foreclosure proceedings and debtor filed a petition under Chapter 11 in December, 1980.

Debtor brought this civil proceeding against the buyers of interests and the association in February, 1981. The complaint contains several claims but those of immediate concern involve the right of debtor to reject the interests as executory land sale contracts, and to relegate buyers to a lien on the interest of debtor in the property. See 11 U.S.C. Section 365(j).[3] This, it was hoped, would enable debtor to sell the property free and clear of these liens under 11 U.S.C. Section 363(f). This, it is believed, is the only prospect for reorganization; otherwise, debtor owns an unsalable "white elephant."

Accordingly, debtor has moved for partial summary judgment on this portion of its complaint. It asks the court to approve rejection of the contracts, and to rule that buyers are not "in possession" of the property, and hence not entitled to the benefits of Section 365(i). Certain buyers and the association have resisted this motion, arguing that the court should not authorize rejection, and that buyers are "in possession" and should not be displaced.

The Court scheduled a hearing for May 28. At that time defendants asked for a continuance pending the outcome of a motion they had filed for appointment of a trustee under 11 U.S.C. Section 1104. The claim of debtor under Section 365 should be suspended, they maintained, because it had conflicts of interest and was therefore incapable of making an impartial decision whether to reject the contracts. Defendants, who believed that the project as originally conceived might be viable, sought an independent arbiter on this point. The Court denied, in part, the request for a continuance and ruled that the contracts are rejectable and that the buyers are not "in possession" of the property. The court, however, granted, in part, the request for a continuance, and withheld the debtor's right to reject the contracts pending disposition of the motion for a trustee. The court provided a special setting for this motion on June 9. This was done because debtor was negotiating a sale of a portion of the property to the State of Utah. This sale had to close, if at all, on or before July

---

2. The non-exclusivity of use is underlined by the fact that a predecessor to debtor sold undivided interests. This raised the spectre of partition, and to avoid complications in this regard, debtor amended the declaration to eliminate any reference to undivided interests and to remove any threat of partition. See Dodgson Affidavit dated May 28, 1981.

3. The debtor in this case remains in control of the business and accordingly exercises the powers of a trustee by virtue of 11 U.S.C. Section 1107.

1. Hence, immediate resolution of these matters was necessary. Debtor and defendants, however, stipulated to a continuance of the June 9 hearing without date. Debtor moved for approval of the sale to the State on June 18. A hearing was held on June 25, and the sale was approved on June 26. Because the sale could not be consummated without rejection of the contracts, debtor also moved for cessation of the continuance and final relief on its motion for partial summary judgment. Because defendants let pass the June 9 opportunity to seek a trustee, and given the emergency status of the case, this motion was likewise granted and (with limitations not pertinent here) debtor was allowed to reject the contracts on June 26. Orders in this regard were entered July 14 and 15.

### PROCEDURAL SETTING

Since the debtor brought this action as a civil proceeding, it now invokes Rule 56, Fed.R.Civ.P., made applicable herein by Rule 756, Fed.R.Bankr.P., on this motion for partial summary judgment. Rule 56, of course, precludes relief where genuine material factual disputes exist. *See, e. g., Harman v. Diversified Medical Inv. Corp.,* 488 F.2d 111, 113 (10th Cir. 1973). Defendants, naturally, stress what in their view are conflicts in the evidence respecting the rejection and "in possession" issues. Moreover, they claim that insufficient time has been allotted for discovery and that the case is therefore not ripe for summary judgment.

The Court is mindful of these concerns. But it is also sensitive to the need for swift administration of estates. The delay characteristic of most litigation frustrates this policy. Thus, courts of bankruptcy have rules of procedure for certain more extended controversies called adversary proceedings and for less complicated disputes known as contested matters. The court has some discretion to channel claims into one or the other procedural category, according to the exigencies of the case. *See generally,* Landers, "The New Bankruptcy Rules: Relics of the Past as Fixtures of the Future," 57 Minn.L.Rev. 827 (1973); Rendleman, "Bankruptcy Revision: Procedure and Process," 53 No.Car.L.Rev. 1197 (1975).

Issues surrounding the rejection of executory contracts are usually treated as contested matters under Rule 914, Fed.R. Bankr.P., rather than as adversary proceedings under Rule 701, Fed.R.Bankr.P.: "Where a debtor in possession seeks leave to reject an executory contract . . . such proceeding should be brought on by application and notice of motion. This is so because the relief contemplated . . . is not one of those . . . touching Adversary Proceedings and, therefore, must under Rule 914 be considered to be a contested matter not otherwise governed by the rules with the result that relief is to be requested by motion and reasonable notice and opportunity for hearing is to be afforded the party against whom relief is sought." 14 Collier on Bankruptcy ¶ 11–53.04[1] at 11–53–10 (14th ed. 1976). Notice and a hearing may be provided on an accelerated basis. *Id.* at 11–53–12. The hearing is an evidentiary hearing. *Id.* ¶ 11–53.04[2] at 11–53–13.[4] Although Rule 914 states that some rules applicable in adversary proceedings, including Rule 756 and hence Rule 56, also apply in contested matters, such rules are not indispensable. Indeed, Rule 914 expressly allows the court to direct their nonuse.

In this case, the court deems it appropriate to forego use of Rules 756 and 56 and to proceed by notice and a hearing under Rule 914. This is justified for several reasons. First, as noted above, this is the procedure called for by the rules. Second, time is short. The sale of land cannot go forward absent a resolution of the executory contract issues. This sale is critical to the reorganization. The land is not easily marketed, and there is a willing buyer who,

---

4. Section 365(a) does not contain the otherwise ubiquitous "notice and a hearing" requirement. *See* 11 U.S.C. Section 102(1) and Local Rule 27. Rule 11–53, Fed.R.Bankr.P., therefore applies. *See, e. g.,* H. Miller & M. Cook, A Practical Guide to the Bankruptcy Reform Act 157 (1979).

because of state budgetary strictures, must close on or before July 1. Third, defendants are not prejudiced. Certain facts discussed below are conclusive on the rejection and in possession issues, and hence, further multiplication of evidence and protraction of the litigation are unwarranted. Moreover, defendants have had opportunity to conduct discovery and to make an evidentiary showing. The petition was filed in December, 1980. This proceeding was commenced in February, 1981. On April 2, a preliminary pretrial conference was held. At that time, defendants "expressed their desire . . . to cooperate with the court in setting an expedited schedule." Affidavit of David Klomp, dated April 20, 1981. May 7 was fixed for trial. On April 21, defendants moved to amend the scheduling order. On April 28, this motion was heard, and on May 12, the motion was granted. The discovery deadline and trial were advanced to June 19 and June 24. Notwithstanding these concessions to defendants (and a further continuance to afford opportunity to move for appointment of a trustee), the file shows that, with the exception of one set of interrogatories served May 13, they have conducted no formal discovery.

This memorandum opinion, therefore, constitutes the court's findings of fact and conclusions of law under Rule 752, Fed.R. Bankr.P., outside the context and procedural limitations of Rules 756 and 56.

## SHOULD DEBTOR BE ALLOWED TO REJECT THE CONTRACTS?

■ Section 365(a) provides: "Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Debtor and defendants agree that rejection cannot occur without court approval, but they differ concerning the standard of review. Debtor argues for a business judgment rule. *See, e. g., In re Ming-*

*es,* 602 F.2d 38 (2d Cir. 1979). Defendants counter that land sale contracts are a special breed of contract and may be rejected only where onerous to the estate. *See, e. g., American Brake Shoe & F. Co. v. New York Rys.,* 278 F. 842 (S.D.N.Y.1922). The former test is met if disaffirmance would benefit the estate; the latter test requires a showing that performance would be unprofitable. *See, e. g., In re Tilco, Inc.,* 558 F.2d 1369, 1372 (10th Cir. 1977).[5]

These arguments do not credit an apparent caveat to the court approval requirement, *viz.,* Section 365(a) by its terms is subject to Section 365(d). Section 365(d)(1) provides that, in Chapter 7, executory contracts are deemed rejected unless assumed or rejected by the trustee within 60 days from the order for relief; Section 365(d)(2) provides that, in Chapter 11, the trustee may assume or reject at any time before confirmation of a plan. Section 365(d)(1), which allows automatic rejection, abridges the court approval requirement of Section 365(a). Section 365(d)(2) allows the court to set a time within which the trustee must accept or reject; yet having forced the election, it would be incongruous if the court did not approve the choice. Moreover, the trustee can treat executory contracts in a plan. *See* 11 U.S.C. Section 1123(b)(2). The plan is confirmed with judicial oversight but the acceptance or rejection of contracts is not approved in the sense contemplated by Section 365(a). This leaves assumption or rejection within the 60 day period in Chapter 7 and assumption or rejection during the hiatus between petition and plan in Chapter 11 subject to court approval. No reason, however, for distinguishing between these situations and those excluded from the coverage of Section 365(a) comes to mind. What is more, the practice of rejection grew out of the law of abandonment. *See, e. g.,* Silverstein, "Rejection of Executory Contracts in Bankruptcy and Reorganization," 31 U.Chi.L. Rev. 467, 469 (1965); yet the trustee may

---

5. One commentator notes that "courts have tended to avoid mechanical tests such as 'business judgment,' or 'loss to the estate.' Rather, emphasis on so-called 'equitable principles' has led to sounder results." H. Miller & M. Cook, A PRACTICAL GUIDE TO THE BANKRUPTCY REFORM ACT 149 (1979).

now abandon property without court approval under 11 U.S.C. Section 554.

■ In any event, court approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course. To begin, this rule places responsibility for administering the estate with the trustee, not the court, and therefore furthers the policy of judicial independence considered vital by the authors of the Code. Second, this rule expedites the administration of estates, another goal of the Bankruptcy Reform Act. Third, the rule encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements.[6] Fourth, the rule is supported by pre-Code cases in this Circuit. Cf. In re Tilco, Inc., supra; King v. Baer, 482 F.2d 552 (10th Cir. 1973); Workman v. Harrison, 282 F.2d 693 (10th Cir. 1960).

Defendants argue that land sale contracts are given special treatment under the Code and therefore may not be rejected unless "burdensome." The fact of special treatment for land sale contracts, however, is inconclusive. Congress expressed concern for buyers under land sale contracts in Sections 365(i) and 365(j). Yet it remained silent on the standard, if any, to be applied in rejecting such contracts. One could infer that Congress eschewed special treatment for the rejection of land sale contracts, else it would have spoken under Section 365(a) as it did under Sections 365(i) and 365(j). Indeed shopping center leases, lessees in possession, and contracts to extend credit are all given special attention in Section 365. If additional protection was intended, a scrivener's pen was not wanting.[7]

Development of the project depends upon the prospects for selling interests. Those prospects are at best speculative and at worst dim. The past, as an index to the future, does not recommend completion of the project. From November, 1977 to late 1979, 170 out of 1,950 interests were sold (notwithstanding the pre-existence of 500 contracts which could have been rewritten). Defendants argue that this was due to designedly poor marketing. It is implausible, however, that debtor would invest millions of dollars in a project and then abandon it.[8] Defendants also argue that other develop-

---

6. Defendants' "burdensome" standard is anomalous in at least two respects. First, its application here, assuming it would result in affirmance of the contracts, means that debtor may propose only one plan, viz., a plan of rehabilitation, whereas the Code allows various plans, including a plan of liquidation. Second, "the purpose of the power to reject is to augment the estate of the debtor. For this purpose, there seems to be no difference between an obligation which consumes cash, and an obligation which, because of its depressive effect on a particular asset or because of its undervaluation of that asset consumes a part of the value of that asset. In the end the latter will turn up as a net reduction in cash available to pay the creditors." Krasnowiecki, "The Impact of the New Bankruptcy Reform Act on Real Estate Development and Financing," 53 Am.Bank.L.J. 363, 382 (1979).

7. Defendants also rely upon two authorities, 3 Collier on Bankruptcy ¶ 365.10 at 365–47 (15th ed. 1980) and In re Jackson Brewing Company, 567 F.2d 618 (5th Cir. 1978), to demonstrate that land sale contracts are rejectable only if "burdensome." Collier, read in context, is speaking of pre-Code law, where treatment of land sale contracts was unsettled and a vendee's status was ambiguous. This may have prompted special scrutiny whenever the trustee proposed to reject such bargains. Pre-Code decisions, however, are not universal in support of this analysis. See, e. g., In re New York Investors Mutual Group, 143 F.Supp. 51, 56 (S.D.N.Y.1956). In any event, the problem has been resolved under the Code. Whether Jackson propounds a "burdensome" test is uncertain. The opinion is inexplicit on this point. Its facts could support a different view. It is cited by later cases in support of the business judgment rule. See, e. g., In re Minges, supra at 43. The King and Workman cases, noted above, from the 10th Circuit, also deal with real estate interests and they follow the business judgment rule. For these reasons, defendants' authorities are not persuasive.

8. Defendants insinuate that termination of sales was due to a conspiracy between debtor and its major creditors, some of whom are affiliated with debtor. Again, a more prosaic explanation is that registration with the Department of Business Regulation expired on November 27, 1979 and debtor believed the expense of renewal, with the possibility of a renewal examination, was not justified. See 6A Utah Code Ann., Sections 57–11–8 and 57–11–10 (1974).

ments are selling similar interests with no difficulty. Assuming the comparability of these developments and the terms of their offerings, they are not burdened with the stigma of bankruptcy. The financial embarrassment of debtor, the uncertainty of these proceedings, and, indeed, the question whether interests are rejectable in the short or long run [9] do not make interests an attractive buy.

This view of the evidence, received in the context of Rule 914, justifies court approval, if any is required, to reject the interests. No extraordinary circumstances exist; interests therefore may be rejected as a matter of course. Alternatively, the facts warrant deference to the business judgment of debtor. Indeed, the facts satisfy the "burdensome" standard. The latter test may be difficult to apply because, as noted above, performance of the interests, and whether this will result in a net loss, depends on more than the internal financial resources of debtor. It depends on the vagaries of the market to sell interests. This market, at present, is thin, and improvement in the future is improbable. Defendants would have the estate bet on the come. But this gamble, with its delay and incalculability, is a burden which the estate, under these circumstances, and in light of other options, need not bear.

### ARE THE BUYERS "IN POSSESSION" OF THE PROPERTY [10] WITHIN THE MEANING OF SECTIONS 365(i) and 365(j)?

Sections 365(i) and 365(j) provide:

(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property under which *the purchaser is in possession*, such purchaser may treat such contract as terminated, or, in the alternative, *may remain in possession* of such real property.

(2) if such purchaser remains in possession—

(A) such purchaser shall continue to make all payments due under such contract, but may offset against such payments any damages occurring after the date of the rejection of such contract caused by the non-performance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and

(B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

(j) A purchaser that treats an executory contract as terminated under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under which *such party is not in possession*, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid. (Emphasis supplied.)

■ The term "in possession" is not defined in the Code. A threshold issue, then, is whether guidance in construing this term should be sought from state or federal sources. Debtor cites treatises on property and state court cases to show that easements in gross are nonpossessory interests.[11]

---

**9.** Even if interests were assumed at this juncture, the development could go downhill, and they could be rejected later. *See* 11 U.S.C. Section 365(g).

**10.** The owners association admits that it is not a "purchaser in possession." *See* paragraph 34 of the Answer. Hence, the sole issue is whether the buyers of interests are in possession within the meaning of Sections 365(i) and 365(j).

**11.** *See, e. g.,* 2 American Law of Property, Sections 8.4 and 8.21 (1952). Restatement, Property, Section 450 (1952); *Concord Corp. v. Huff,* 144 Colo. 72, 355 P.2d 73 (1960); *Park County Rod & Gun Club v. Department of Highways,* 163 Mont. 372, 517 P.2d 352 (1973); *Boyd v. McDonald,* 81 Nev. 642, 408 P.2d 717 (1965); *State v. California Oregon Power Co.,* 225 Or. 604, 358 P.2d 524 (1961); *Florida Power Corp. v. McNeely,* 125 So.2d 311 (Fla.Ct. App.1960); *Henry Bickel Co. v. Texas Gas*

While these authorities may be helpful in some instances, they are not controlling. Where possible, the Code should be given a federal meaning. This permits uniformity in a *national* bankruptcy system; it promotes exegesis in line with bankruptcy policies. Construing "in possession" according to the abstract, sometimes rarefied, and frequently arcane precepts of state property law is therefore inappropriate.[12] The federal purport of "in possession" may be derived from Sections 365(i) and 365(j) and their legislative history, which, in turn, must be discussed, analyzed, and applied to the interests in this case.

### Sections 365(i) and 365(j)

According to the statutory scheme, a purchaser in possession has several advantages over a party not in possession. A purchaser in possession may elect to terminate the contract and receive a lien under Section 365(j), or he may remain in possession, continue to pay on his contract, and receive title to the property. This is in contrast to a party not in possession who has no choice and *must* accept a lien under Section 365(j). This lien is for "the recovery of any portion of the purchase price that such . . . party has paid." At least two economic benefits accrue to purchasers in possession which are denied parties not in possession. First, the purchaser in possession takes the land with any appreciation in value while the party not in possession is relegated to a lien for amounts paid. Second, purchasers in possession receive an offset on the contract price for damages resulting from rejection. The party not in possession, is awarded damages, not by way of offset, but as an unsecured creditor under 11 U.S.C. Section 502(g). The interface of Sections 365(i) and

365(j) is noteworthy in one final respect. The statutes speak of a *purchaser* in possession and of a *party* "whose executory contract to purchase real property from the debtor is rejected and under which *such party* is not in possession." (Emphasis supplied.)

### The Legislative History

These aspects of the statutory scheme are further elucidated by the legislative history. Sections 365(i) and 365(j) originated with the Commission Report, *see* Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No.93–137, Part II, Sections 4–602(d) and 4–602(f)(1) (1973), which emphasized that Section 4–602(f)(1), the predecessor to Section 365(i), "protects a consumer who is purchasing a residence under a long-term land sale contract not passing title until the full purchase price has been paid." *Id.* at 158. The Commission's innovations in the field of land sale contracts were derived from a working paper, *see id.* at Part I, 199 n.114, 206 n.160, Part II 158 n.17, 172–173 n.21, which was later published as Lacy, "Land Sale Contracts in Bankruptcy," 21 U.C.L.A.L.Rev. 477 (1973). This paper further explains the rationale for special treatment of purchasers in possession: "The purchaser in this kind of contract is likely to be the buyer of a home or farm or small business who has adjusted to a new location. Very often, especially in the case of a residential buyer, he will be poor. Certainly, modern American bankruptcy policy places as high a value on relieving the poor from the consequences of their own and others' improvidence as in doing perfect justice between creditors." *Id.* at 484. *See also* Krasnowiecki, "The Impact of the New Bankruptcy Reform Act

*Transmission Corp.*, 336 S.W.2d 345 (Ky.Ct. App.1960).

12. Debtor, for example, relies on *State v. California Power Company*, 225 Or. 604, 358 P.2d 524 (1961). There a utility owned an easement for its power lines across property upon which a fire erupted. The State of Oregon aided in extinguishing the fire. Oregon statutes imposed liability on "the owner, operator and person in possession of land on which a fire exists" for expenses incurred by the state for fire abatement. Oregon sued the utility under these statutes and the question was whether the utility, by virtue of its easement, was "in possession" of the land. The court held that it was not. The statutes being construed were designed to allocate the burdens of fire control; Section 365(i), in contrast, was intended to confer benefits on certain creditors. There is no similarity in purpose between the two.

on Real Estate Development and Financing," 53 Am.Bank.L.J. 363, 383–384 (1979).

### Analysis

It is possible to deduce the type of "possession" which Congress sought to protect from the statutory scheme and this legislative history. Allowing the purchaser to remain in possession and to receive title suggests a concern for buyers whose connection with the land is more permanent than ephemeral, more continuous than intermittent, more exclusive than shared, and more personal than delegable. The Commission's emphasis on dislocation, for example, is meaningless in the event a contract is transferred to another. Indeed, the distinction between "purchaser in possession" and "party not in possession" may reflect congressional awareness that buyers under land sale contracts often assign their interest to third parties.

Allowing the purchaser to retain the investment value of the land also has significance. It is unlikely that Congress wanted to encourage investment in any speculative sense.[13] Rather, the mention of residential buyers, consumers, and the poor in the Commission Report and Lacy article suggests a concern for buyers whose connection with the land is in fee simple, not fractionated, and is more productive and long term than speculative and short term. Congress intended to prevent the forfeiture of investment gains by the poor rather than to create investment opportunities for the rich.

### Application

■ In this case, the interests partake of few, if any, of these qualities. Use of the property is intermittent. Members resort to the park for vacations. Indeed, they are forbidden to make any permanent improvement on the property. Use of the property is shared. The easement in gross is non-exclusive by design, to avoid partition and to facilitate the recreational concept. Use of the property is delegable. Purchasers may designate someone other than themselves to be members. The Commission and congressional concern respecting dislocation of buyers is therefore inapposite: purchasers of interests are not being displaced from a residence or place of business. Concern for the indigent is likewise inapposite since interests are for diversion and affordable by those with discretionary income. Moreover, interests are susceptible to speculation because they are divisible and transferable without restriction. On this analysis, purchasers of interests are not "in possession" of the property within the meaning of Sections 365(i) and 365(j).[14]

---

**13.** Giving purchasers the option to affirm or terminate their contracts, from one view, could encourage speculation at the trustee's expense. Buyers could wait and watch: if their interest in the land increased in value, they could opt for Section 365(i); if it decreased in value, they could rescind and take a lien under Section 365(j). *Cf. Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527 (10th Cir. 1962); *Hickman v. Groesbeck*, 389 F.Supp. 769 (D.Utah 1974). Such speculation is improbable given the usual stability of real estate values. *But compare e.g., Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978) with *McCown v. Heidler*, 527 F.2d 204 (10th Cir. 1975). *See generally* Berman and Stone, "Federal Securities Law and the Sale of Condominiums, Homes, and Homesites," 30 Bus.Law. 411 (1975). This would not hold, however, for certain interests in land, especially fractional interests in mortgages or trust deeds which have been targeted for regulation by the Securities and Exchange Commission. *See e. g.,* SEC Release Nos. 33–3892 and 34–5633, CCH Fed.Sec.L.Rep. ¶ 2755 (January

31, 1958). *See also Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187 (5th Cir., 1979) (condominium campsites); *Recreation Unlimited*, CCH Fed.Sec.L.Rep. ¶ 78,129 (SEC NAL, April 23, 1971) (recreational use permits); *Great Western Campers Association*, CCH Fed. Sec.L.Rep. ¶ 78,386 (SEC NAL, August 13, 1971) (memberships in campers association).

**14.** Legislative history may supply one further insight into the type of possession contemplated under Section 365(i). The Commission scheme for treatment of land sale contracts was to forbid rejection of possessory contracts and to allow rejection of nonpossessory contracts. In the case of nonpossessory contracts provision was made for a lien which in turn was subject to the preference but not other avoidance powers. *See* Report of the Commission on the Bankruptcy Laws of the United States, *supra* at Sections 4–602(d) and 4–602(f)(i). This scheme was implemented in bills submitted in the 94th Congress. *See* H.R. 31 & S. 236, 94th Cong., 1st Sess. (1975). H.R.

31, generally known as the Commission's Bill, modeled the Commission proposal. The National Conference of Bankruptcy Judges, which had established a panel to review the Commission proposal, introduced a competing measure in the same Congress. *See* H.R. 32 & S. 235, 94th Cong., 1st Sess. (1975). H.R. 32, generally known as the Judges' Bill, limited the Commission proposal and H.R. 31 by making possessory as well as nonpossessory contracts subject to the preference powers. After several years of legislative study, new bankruptcy reform bills were introduced in the 95th Congress. *See* H.R. 8200, 95th Cong., 1st Sess. (1977) and S. 2266, 95th Cong., 2d Sess. (1978). Neither of these measures, however, made any reference to lien avoidance in connection with possessory or nonpossessory contracts. The significance of this omission is subject to speculation. Congress, however, may have recognized that nonpossessory contracts are often unrecorded or unrecordable and would therefore fall prey to the trustee's strong arm powers newly embodied in 11 U.S.C. Section 544(a)(3). *See, e. g.,* Krasnowiecki, *supra* at 384. If so, the objective of rescuing land sale contract buyers from the unjust consequences of prior law would have been defeated. Congress may have applied the same reasoning to possessory contracts, but with the further recognition that, in many states, possession by contract vendees is a substitute for recording, thus protecting buyers "in possession" from the trustee and Section 544(a)(3). If this were, indeed, one of Congress's reasons for dropping the lien avoidance provisos, it would suggest that the criteria for "possession" as constructive notice under certain recording statutes may be the criteria for "possession" under Sections 365(i) and 365(j). *Cf.* Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-for-Lawyers Bill, Part IV," 1980 Utah L.Rev. 19, 25 n.28.