In re SOMBRERO REEF CLUB, INC., d/b/a Latitude 24° Club Resort and d/b/a Latitude 24° Vacation Club, a Florida corporation, Debtor.

SOMBRERO REEF CLUB, INC., d/b/a Latitude 24° Club Resort and d/b/a Latitude 24° Vacation Club, a Florida corporation, Plaintiff.

v.

Leonard ALLMAN, et al., Defendants.

Bankruptcy No. 80–01266–BKC–JAG.
Adv. No. 81–0583–BKC–JAG–A.

United States Bankruptcy Court,
S. D. Florida.

March 24, 1982.

**614**

Samuel L. Heller, Law Offices of Samuel L. Heller, P. A., Fort.Lauderdale, Fla., for plaintiff.

### PARTIAL FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

The principal asset of the debtor, Sombrero Reef Club, Inc., is a resort-marina complex in the Florida Keys. Prior to the bankruptcy reorganization, it unsuccessfully attempted to turn the property into a time-share operation, and approximately 200 valid time-share purchase agreements exist as a result of that effort. It now wishes to sell the real property and this adversary proceeding is part of the litigation it has brought to clarify the rights of all parties claiming an interest in the real property.

In the main bankruptcy proceeding, the debtor, Sombrero Reef Club, Inc., filed a motion to reject executory contracts (Case No. 80–01266–BKC–JAG, C.P. No. 101) in conjunction with its motion for leave to sell real property. At approximately the same time, it filed its complaint for declaratory judgment (Adversary Case .No. 81–0583–BKC–JAG–A, C.P. No. 1) against the debtor's time-share purchasers, seeking a declaratory judgment that the time-share contracts were not unexpired leases or executory contracts for the sale of real property and that upon rejection of those contracts, the defendants would have no further rights in the underlying real property. Numerous responses, answers to the complaint, and counterclaims were filed, and the motion was heard and trial held jointly on November 24, 1981 and at the continued hearing date of December 2, 1981. A number of individual time-share contract holders, as well as attorneys on behalf of time-share purchasers and attorneys for mortgagees, appeared at both of these hearings. Subsequent to the December hearing, but prior to a determination having been made by this court, the debtor requested that the court stay the proceedings because it had reconsidered its decision to reject the time-share contracts.

At the November 24, 1981 hearing and trial, the court concluded that a separate adversary proceeding would be required to determine the validity and priority of the various mortgage and lien rights in the real property. In January, 1982, a complaint was filed to determine the validity, priority and amount of liens and for leave to sell free from lien and other interests (Adversary Case No. 82–0003–BKC–JAG–A, C.P. No. 1). This was set for February 24, 1982, at which time it was generally agreed by all the parties in attendance that the issue of priority should not be tried until a determination had been made on the time-share contracts adversary.

There were at least two versions of the time-share purchase agreements which Sombrero used, but they differed only slightly. A prototype, titled "Latitude 24° Vacation Club Membership Agreement" was admitted as debtor's Exhibit No. 2. Purchasers would pay an initial price ranging from under $1,000 to over $3,000 for the right to use the chosen type of accommodation for one week in a year with that right extending for a period of thirty years. In addition, each member was required to pay annual dues, with the initial rates varying from $42 to $84. The annual dues charge could be adjusted for inflation. The original price and annual dues rate varied according to the type of accommodation selected and which of three seasons the purchaser's vacation week would fall within. Each year members could reserve their particular vacation week not less than sixty days prior to the desired date nor more than one year prior to the date. Reservations were on an "as available" basis, and members could not designate specific rooms or accommodations. Sombrero Reef was responsible for all obligations of maintaining and operating the facility, including main-

tenance of insurance, provision of utilities and furnishing the rooms as well as providing maid service and activities programmed.

The basic purchase price could be paid in full initially or on installment terms. Some defendants had fully paid and others had not completed making their installments on the purchase price. Installment payments continued to be collected following the filing of the chapter 11 petition in bankruptcy, but the debtor-in-possession did not collect, and instructed its collecting agent, the Bank of California, not to collect any further installments once the motion to reject the contracts was filed. Some of the contract holders paid their annual dues during this period, but Sombrero Reef made no effort to collect them. Likewise, some persons utilized their vacation weeks but others were unable to. The debtor-in-possession maintained that the only persons turned away were so treated because reservations were full, but the quality of accommodations and services provided during the reorganization period has been below the level originally anticipated by all parties.

Some of the time-share contract accounts receivable were assigned as security for loans obtained by Sombrero Reef from individuals. Those individuals not only object to the rejection of the contracts, but request that, if the contracts comprising their collateral are rejected, they be given adequate protection.

Sombrero Reef has made previous attempts to sell the property and has entered into several previous contracts for sale, none of which was consummated in a closing. On April 21, 1981, an order authorizing sale to one of these earlier proposed purchasers was entered (Case No. 80–01266–BKC–JAG, C.P. No. 72). That purchaser wished to assume the contracts and the order authorized such assumption. Now, however, the debtor-in-possession believes it is necessary to reject the time-share contracts in order to sell the real property.

Counsel for plaintiff and for several defendants have ably assisted the court in its determination of the multiple issues, through argument and submission of post-trial memoranda.

11 U.S.C. § 365 permits the rejection of an executory contract by a trustee or debtor-in-possession and sets forth the effect of and the rights of parties upon rejection. That section specifically controls the primary issues in this case.

Certain defendants here argue that Sombrero may not now reject the contracts because they were assumed, as ratified by the order of April 21, 1981 (Case No. 80–01266–BKC–JAG, C.P. No. 71). Sombrero argues that that assumption was contingent upon the closing of the sale contemplated in that order, and that no closing or assumption occurred. Under § 365, in a chapter 11 proceeding, a prior assumption will not prevent a subsequent rejection. Section 365(d)(2) provides:

In a case under chapter 9, 11, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

This does not directly address the issue of a change of mind by a trustee, but § 365(g)(2)(B)(ii), for example, does clearly contemplate a rejection subsequent to an assumption, and clarifies the intent of the earlier subsections of § 365.

Further, the court cannot conclude that the debtor-in-possession is estopped from now rejecting the contracts. Although payments were received on the contracts, this could be the case any time there is a prior assumption, and since § 365 authorizes such a course of action it would be contrary to the intent of § 365 to conclude that these very events could estop a debtor-in-possession from exercising its right to reject.

As to the defendants who took accounts receivable as collateral, the court concludes that Sombrero is not now estopped from rejecting the contracts because of a stipulation it entered into in a previous

adversary action (Respondent Walker and Jackson's Exhibit No. 1) substituting valid contracts for ones in default. There is no language in the stipulation precluding Sombrero from rejecting any contracts, or guaranteeing the value of the collateral.

 Defendants' next position is that the contracts for which the purchase price has been paid in full are no longer executory and therefore cannot be rejected. The court concludes that these time-share contracts are all executory, including the ones for which the "purchase price" has been paid in full.

The legislative history for § 365 provides: "Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 347 (1977) [1978] U.S.Code Cong. & Ad. News 5787, 6303; S.Rep.No.95–989, 95th Cong., 2nd Sess. 58 (1978), [1978] U.S.Code Cong. & Ad.News 5844. A more exacting standard was set by Professor Countryman who defined an executory contract (in discussing the term under the former Bankruptcy Act) as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy*, 57 Minn.L.R. 439, 460 (1973).

Many courts have considered what definition to use and how to apply it to cases in widely differing fact situations. The Fifth Circuit Court of Appeals has stated:

. . . a contract is executory when something remains to be done by one or more of the parties. An executory contract is one in which a party binds himself to do or not do a particular thing, whereas an executed contract is one in which the object of the agreement is already performed. *Ozark-Mahoning Co. v. American Magnesium Co.*, 488 F.2d 147, 152 (5th Cir. 1974).

In situations somewhat analogous to the case here, where two separate debtors had contracts requiring services over a period of years to parties who had already paid in full for those services, two bankruptcy courts reached different conclusions as to the executory nature of the contracts. In *Lake Minnewaska Mountain Houses, Inc. v. Smiley*, 11 B.R. 455 (Bkrtcy.S.D.N.Y.1981) the debtor had a duty to provide hotel rooms, facilities, and food to the defendants (Ruth Smiley and her descendants) during their visits each year, for the nominal cost to defendants of $1 per year for 99 years. In *dicta*, the court reasoned that the contract was no longer executory because one party had no further substantial obligations to perform and the other had received all the consideration for which it had bargained. On the other hand, in *In Re The Brethren's Home*, 5 B.C.D. 658 (Bkcy.Ct.S.D.Ohio 1979), the court concluded that life care contracts of residents in a retirement home were executory and could be rejected, even where the residents had either paid a certain lump sum or assigned all their property to the home at the time they entered it, and had no further obligations.

It is true that the contract holders in this case who have paid the initial fee in full have purchased something (just what that "something" is will be discussed further below,) but the completion of that purchase does not preclude a finding that the overall contract is executory. In fact, substantial obligations remain to be performed on both sides. The debtor-in-possession must maintain the property and provide accommodations and services for one or more weeks per contract holder for at least twenty-five years from now. Defendants downplay the obligations still due from the contract holders, but in contrast to the contracts in the cases cited above, the annual dues requirement from each defendant here is not a *de minimus* obligation. If each contract were to run its course, the total of the annual dues would be substantially more than the initial "purchase price" even without any cost of living increases. By entering into the contracts, the buyers obligated themselves to pay these annual fees *whether or not* they utilized the accommodations (para-

graph 14). And, if the annual dues are not paid, the membership may be cancelled without any reimbursement (paragraph 20). This militates against a conclusion that something of value separate and apart from the ongoing yearly obligations has been purchased upon payment of the purchase price. And, the failure of either party to complete its yearly performance would constitute a material breach excusing the performance of the other. Therefore, all the contracts are deemed to be executory.

■ Defendants next argue that the debtor-in-possession's decision to reject cannot be automatically approved by the court and that, in fact, rejection of the contracts is not in the best interest of the estate and should not be approved.

It may well be that under the policy of judicial independence mandated by the Code, and in light of the purpose and effect of § 365 as a whole, a trustee or debtor-in-possession's decision to reject should usually be approved, and rejection denied only where the trustee's decision was clearly erroneous. See, e.g. *In re J. H. Land & Cattle Co., Inc.*, 8 B.R. 237 (Bkrtcy.W.D.Ok.1981) and *Summit Land Company v. Allen*, 13 B.R. 310 (Bkrtcy.D.Utah 1981). If the court rather than the trustee is to decide, this court is satisfied that the "business judgment" test, rather than the "burdensome" test is to be applied. *In re Jackson Brewing Company*, 567 F.2d 618 (5th Cir. 1978); *In Re Minges*, 602 F.2d 38 (2d Cir. 1979). The "business judgment" test essentially requires a showing that rejection will benefit the estate. Here an expert for defendants testified that these contracts could provide a good basis for a new sales program, especially since word of mouth advertising by owners is the best method of obtaining new sales. Even assuming such is generally true in the industry, the disgruntlement of present time-share owners at the inadequacy of facilities and at the problems created by the reorganization proceedings, as well as the stigma attached because of the history of the past development would counteract whatever benefit there would otherwise be. The court concludes that the debtor-in-possession has made the requisite showing that rejection would benefit the estate.

■ The court having approved the rejection of the time-share contracts, plaintiff seeks a determination that the contracts are not leases and not contracts for the sale of real property because, under certain circumstances, special protections are given to the rejected parties for these types of contracts. All parties agree that the contracts give some type of time-share interest to the purchasers of these contracts, but there is no agreement about the nature of that interest. For purposes of this case, it need only be decided whether or not the interests fall into either of the above two categories. Section 365(h)(1) covers leases:

> If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, the lessee under such lease may treat the lease as terminated by such rejection, or, in the alternative, may remain in possession for the balance of the term of such lease and any renewal or extension of such term that is enforceable by such lessee under applicable nonbankruptcy law.

and § (i)(1) deals with sales of real property:

> If the trustee rejects an executory contract of the debtor for the sale of real property under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property.

Turning to the contract itself (the memorialization of the entire agreement between the parties), the title is "Latitude 24° Vacation Club *Membership* Agreement" (emphasis added). The drafters appear to have been unwilling to describe or limit the contract to a more definite or conventional category of real property interest.

Paragraph 15, "Assignment of Benefits and Sale of Membership", covers all possibilities with the restriction: "You may not rent your accommodations or enter into any sub-lease or sub-license agreement. We will not make rental, sub-lease or sub-license arrangements for you."

Therefore the court must make a determination of the nature of the contract from an analysis of its terms. Paragraph 3, "What You Are Buying", provides: "The type of club membership you are purchasing at the Resort gives you and us various rights, privileges and obligations. The primary ones follow:" The separate paragraphs following this introductory paragraph cover type of membership, type of accommodations and time period, amount of use, choice of accommodations, seasons, time periods, purchase price, finance charge, reserving accommodations, annual dues and so on. Paragraph 11 provides that, in addition to the "purchase price", "annual dues" are to be paid "for the privilege of utilizing the accommodations selected and other membership privileges." Paragraphs 12 and 13 provide in part, "Your privilege is to use a type of accommodations [sic] and not a specific unit," and that use is "on an 'as available' reservation basis". In paragraph 15, it is stated explicitly: "You understand that you will not have any interest in the properties or operations of the Resort, or any of its rooms or other facilities, or in the revenues therefrom, except the right to reserve and occupy accommodations and use certain facilities upon the terms and conditions contained in this Agreement."

Based on these provisions, the court concludes that the time-share contracts here do not fall under either subsection (h) or subsection (i) of § 365. Subsection (i) does not refer to an "interest" in real property or an "estate" in real property; it refers only to a "sale of real property". The legislative history refers to "a purchaser of real property under a land installment sales contract", H.R.Rep.No.95–595, 95th Cong., 1st Sess. 349–50 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 60 (1978), U.S.Code Cong. & Admin.News pp. 5846, 6306. See 2 *Collier on Bankruptcy*, 15th ed. ¶ 356.10. Under the time-share contracts in question, no delivery of title of any kind was contemplated. Nothing more was given or to be given than a right to use the property on certain agreed terms. It was specifically set forth that the contract purchasers would have no interest in the properties except the right to reserve and occupy accommodations. This does not amount to a sale of property under § 365(i).

Neither do the Florida statutes identify or limit the nature of time-share agreements, although in the 1981 legislative session, the Florida legislature enacted the Real Estate Time Sharing Act, Ch. 721, Fla.Stats. In § 721.05(14), Fla.Stats., a "time sharing plan" is defined to include all possible types of legal interests:

"Time sharing plan" means any arrangement, plan, scheme, or similar device, but not including exchange programs, whether by membership, agreement, tenancy in common, sale, lease, deed, rental agreement, license, right to use agreement, or by any other means, whereby a purchaser, in exchange for consideration, receives a right to use accommodations or facilities, or both, for a specific period of time less than a full year during any given year, but not necessarily for consecutive years, and which extends for a period of more than 3 years.

It is also more specifically recognized that sale of a time share does not necessarily require the conveyance of any interest in real property. Among items which must be included in a contract for sale is "[a] description of the nature and duration of the time share period being sold, including *whether any interest in real* property is being conveyed..." § 721.06(5), Fla.Stats.

Although a more difficult question, the court also concludes that the contracts are not leases protected under § 365(h). Section 365(i) makes a distinction between sales of real property where the purchaser is in possession and where the purchaser is not. Section 365(h) does not make a distinction between leases where the lessee is in possession and where he is not, but implies the necessity of possession by referring to a lessee *remaining* in possession. Possession is not defined. If these time-share contracts were leases, it might be that they would be denied protection under subsection (h) because the defendants were not "in possession". However, given the

concepts of constructive possession and possession by agents which might be encompassed in § 365(h), the court does not rule on that basis. Instead, the lack of physical possession here is one of the indicia that the agreements were not leases.

No intention of the parties to consider the contract a lease appears on the face of the prototype contract, and there is not sufficient basis for the court to construe it to be a lease. It is labeled a "membership agreement", not a lease, and the terms "landlord" and "tenant" or "lessor" and "lessee" are not used anywhere. The term "sublease" appears only in a negative and disjunctive form in paragraph 15, quoted above. The executed agreements do not conform with the witnessing requirements for leases of a term of more than one year. Members had no rights to use any particular rooms, or to use them at any specific time. In fact, they were not guaranteed a right to use them at all unless they were willing to use them at a time which was available. They did not purchase a right to occupy and use certain real estate for a certain period—a lease—but rather, purchased a qualified right to obtain accommodations of a certain quality within certain time periods. The "membership" which each purchased is more akin to an option to make reservations at a hotel on stated terms. Despite various theoretical arguments, the right to possess *or* use was a very small part of what the purchasers bargained for and got. The rooms alone would be of very little value to the members without the accompanying services provided by Sombrero. Although leases vary as to the degree of services provided by the landlord, the services and facilities here were such a substantial part of each contract that they appear to be something *other* than leases of real property.

The court has not found any bankruptcy cases which determined the same issues. In *Summit Land Company v. Allen, supra,* the debtor was permitted to reject contracts for the sale of interests in recreational property. Under the contracts, purchasers could hunt, fish, hike and camp on the property, but not build structures. On the issue of possession, the court observed that the concern of Congress was for "buyers whose connection with the land is more permanent than ephemeral, more continuous than intermittent, more exclusive than shared, and more personal than delegable." 13 B.R. 318. However, in that case all parties agreed that the contracts were for the sale of real estate, and the issues were whether rejection should be permitted and whether the land purchasers were in possession under § 365(i). The legislative history and many of the considerations there are not appropriate here.

■ Finally, defendants suggest that there is significance to the nondisturbance agreements obtained by Sombrero from the mortgagees, and the state law which precipitated the agreements.

Paragraph 21 of the contract, "Non-Disturbance Agreements", provides:

This property is presently encumbered. However, to protect your rights fully, we have complied with Chapter 2–23–09 of the Florida Administrative Code by obtaining non-disturbance agreements from all mortgagees. These agreements have been recorded and are available for your inspection.

Copies of the non-disturbance agreements which Sombrero obtained were introduced as Debtor's Composite Exhibit No. 1. Prior to enactment of Chapter 721, Fla.Stats., time-share contracts were regulated under the Florida Administrative Code, which was in effect at the time these contracts were sold and which required the non-disturbance agreements.

The court concludes that the non-disturbance agreements and provisions do not create a protectible interest under § 365(h) or (i) where one does not exist otherwise. In other contexts, non-disturbance clauses in leases provide protection to lessees and put limitations on mortgagees, but that superiority of "rights" in a lessee does not give a lessee an ownership interest in the real property. Likewise, such agreement will not create a lease. The vacation club members here certainly had a right to use the

property under certain conditions, and the non-disturbance agreements protected that right to use, as Florida law requires. The agreements themselves refer to the business of "selling certain rights to use" and the covenant is to not disturb any rights of "members" as set forth in the "club membership agreement". Thus the non-disturbance agreements do not acknowledge or create anything more than a purchaser's right to use.

■ A final issue is whether or not Sombrero is precluded from rejecting the contracts because the statutes and the terms of the contract require that the real property only be sold subject to the time-share owner's rights. Section 721.17, Fla.Stats. provides in pertinent part:

No seller shall sell, lease, assign, mortgage, or otherwise transfer the seller's interest in the accommodations or facilities of a time sharing plan to a third party, unless:

(1) Said third party agrees in writing to fully honor the rights of purchasers of the time sharing plan to occupy and use said accommodations or facilities.

(2) Said third party agrees in writing to fully honor the rights of purchasers of the time sharing plan to cancel their contracts and receive an appropriate refund, as provided in this chapter.

(3) Said third party agrees in writing to comply with the provisions of this chapter for as long as said third party continues to sell the time sharing plan, or for as long as purchasers of the time sharing plan are entitled to occupy the accommodations or use the facilities, whichever is longest in time.

(4) Said third party agrees to assume all obligations of the seller to purchasers.

The contract, in paragraph 23 guarantees:

We will not sell the land or improvements which contain the accommodations you are purchasing the right to utilize during the term of your Club membership unless the Buyer agrees in writing to assume all of the obligations of Latitude 24 to you and the other Club members.

Although this term is included in the contract, a party may choose to breach its contract and bear the consequences. Rejection of a contract under § 365 is a breach (§ 365(g),) and therefore the fact that the action constitutes a breach is not grounds for denying rejection. Provision for damages is also made in § 365(g).

■ If the Florida statute is an attempt to prohibit such a breach by a time-share developer it is preempted by federal bankruptcy law. Even if a state legislature has some purpose in mind other than frustrating the operation of federal law, if a state statute has the effect of frustrating federal law it is invalid under the Supremacy Clause of the United States Constitution. *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). The Florida legislature presumably had the intent of protecting time-share owners, an intent which this court is in sympathy with, but to the extent that Chapter 721, Fla.Stats. frustrates the operation of bankruptcy law, the statute is invalid. Therefore it is not a bar to rejection of the contracts.

The contracts having been rejected, the defendants are entitled to damages and have claims for such damages. The amount of damages as to each defendant will be determined at a hearing to be set by the court. The counterclaims seeking damages will likewise be concluded at that hearing.

All issues regarding adequate protection as to the creditors secured by the accounts receivable will be set for further hearing at the same time.

Issues of validity and priority of liens, if applicable to any defendant's interest in view of the ruling in this matter, will be litigated in Adversary Case No. 82–0003–BKC–JAG–A.

Pursuant to B.R. 921(a), a Partial Final Judgment incorporating these partial Findings and Conclusions is being entered this date and a Final Judgment will be entered following a hearing on the amount of damages.