In re SAPOLIN PAINTS, INC., Debtor and Debtor-in-Possession.

In re WOOLSEY MARINE INDUS-TRIES, INC., Debtor and Debtor-in-Possession.

Bankruptcy Nos. 180–01691–21, 180–01807–21.

United States Bankruptcy Court, E. D. New York.

June 1, 1982.

Stroock & Stroock & Lavan, New York City, for debtors; John F. Scheffel, New York City, of counsel.

Day, Berry & Howard, Hartford, Conn., for Connecticut Bank & Trust Co.; John B. Nolan, Hartford, Conn., of counsel.

Ballon, Stoll & Itzler, New York City, for Metropolitan Greetings, Inc.; Ronald S. Itzler, New York City, of counsel.

Angel & Frankel, P. C., New York City, for Creditors' Committee; Eric S. Brown, New York City, of counsel.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

The issue in this proceeding is whether or not Sapolin Paints, Inc. ("Sapolin" or "Debtor"), has assumed and assigned a cer-

tain lease with the Connecticut Development Authority. The lease covers premises located partly in Ridgefield and partly in Danbury, Connecticut, referred to as the "Danbury Facility."[1] The Connecticut Bank and Trust Co. ("Connecticut Bank"), the assignee of the lessor's interest in that lease, has filed an application with this Court pursuant to 11 U.S.C. § 365(d) for an order to establish "a specific period of time for the debtor to assume or reject such lease." Sapolin has filed a response asserting that the lease has been assumed and assigned, and that the Connecticut Bank has "waived any right to object thereto."

It is undisputed that Sapolin, which is engaged in liquidating its assets under Chapter 11 of the Bankruptcy Code, assigned the lease in question to Metropolitan Greetings, Inc. ("Metropolitan")[2] on July 7, 1980 as part of a sale of all Sapolin's assets approved by the bankruptcy court on June 17, 1980, and that the assignment of such lease was duly recorded in Connecticut on July 10, 1980. It is also undisputed that Metropolitan has made payments to Connecticut Bank pursuant to the terms of the lease and has been paying taxes on the leased premises. Nevertheless, the Connecticut Bank contends that the lease has been neither assumed, nor assigned, because, it contends, there has been no compliance with the requirements of 11 U.S.C. § 365.

## I.

### THE RELEVANT SECTIONS OF THE CODE

Connecticut Bank has identified its application as one made under § 365(d) of the Bankruptcy Code. Section 365(d) finds its place in the section of the Code which deals

1. The lease was assigned to Sapolin on May 2, 1977 by the original lessee, Edmund Realty Corporation.

2. Subsequent to the assignment, Metropolitan Greetings, Inc. changed its name to Metropolitan Consolidated Industries, Inc. For convenience, "Metropolitan" is used to designate the company throughout.

broadly with "Executory Contracts and Unexpired Leases" in Title 11 proceedings. By virtue of 11 U.S.C. § 103(a), § 365 applies to all cases under Chapters 7, 11, and 13.

As noted in an earlier opinion filed in this proceeding,[3] Section 365 replaces § 70b (former 11 U.S.C. 110(b)) of the Bankruptcy Act and alters the prior law with respect to unexpired leases in several important respects. 2 *Collier on Bankruptcy* ¶ 365.02 (15th ed. 1981).

One of the most significant changes is the denial of enforceability to *ipso facto* bankruptcy clauses that condition the term of a lease on insolvency or the initiation of bankruptcy proceedings. 11 U.S.C. § 365(e)(1). 2 *Collier on Bankruptcy* ¶ 365.-06 (15th ed. 1978).

■ Other changes elaborate on and change prior law respecting the assumption and assignment of unexpired leases. Subsection (a) of § 365 authorizes the trustee to assume or reject any unexpired lease "subject to the court's approval."[4] 11 U.S.C. § 1107(a) gives the debtor-in-possession all the rights and powers of a Chapter 11 trustee. The references in § 365 as to what the trustee may do, therefore, include a debtor-in-possession.

Subsection (d)(2) of § 365, under which the present application is made, provides that in a Chapter 11 proceeding:

"the trustee may assume or reject an * * unexpired lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to such * * lease, may order the trustee to determine within a specified period of time whether to assume or reject such * * * lease."

If the lease is in default and such default is in respect to some provision of the lease

3. *In re Sapolin Paints, Inc.*, 5 B.R. 412, 6 B.C.D. 776, 2 C.B.C.2d 854 (Bkrtcy.E.D.N.Y.1980).

4. 11 U.S.C. § 365(a) provides: "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

other than one relating to insolvency, the commencement of a Title 11 case or the appointment of a custodian for the debtor's property (11 U.S.C. § 365(b)(2)), the default must either be cured or adequate assurance be provided of its cure before the lease may be assumed; the other party must be compensated for any loss from such default; and the trustee must provide "adequate assurance of future performance under such * * * lease." 11 U.S.C. § 365(b)(1).[5]

Section 365(f)(2) governs the assignment of leases; it contains three paragraphs. The first provides, with an exception not relevant here, that an unexpired lease may be assigned "under paragraph (2) of this subsection" "notwithstanding a provision in an * * * unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such * * * lease." 11 U.S.C. § 365(f)(1). Subsection (2) imposes two conditions on the assignment of an executory contract or unexpired lease: (a) the trustee must assume such lease in accordance with § 365, and, (b) the trustee must provide "adequate assurance of future performance by the assignee of such contract or lease * * * whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). The third paragraph of subsection (f) nullifies any provision in an unexpired lease creating a right to modification or termination because of the assumption or assignment of such lease by the trustee. 11 U.S.C. § 365(f)(3).[6]

Subsection (k) of § 365 provides that assignment by the trustee leaves the trustee and the estate free from any liability for any breach of the lease occurring after such assignment. 11 U.S.C. § 365(k).

## II.

## THE FACTS

### A. The Lease of the Danbury Facility

Sapolin filed for relief under Chapter 11 of the Code on April 8, 1980 and is now a debtor-in-possession pursuant to 11 U.S.C. § 1101. Sapolin's wholly-owned subsidiary, Woolsey Marine Industries, Inc. ("Woolsey"), filed on April 14, 1980. By order of the Court, these two proceedings are being jointly administered.

Because Sapolin at the time it filed for relief lacked the money to continue operating, it embarked on a program looking to the liquidation of all of its assets as permitted by 11 U.S.C. § 1123(b)(4). At the time Sapolin filed its petition, it was the lessee, by assignment, of the "Danbury Facility" (the "Facility"). The term of the lease runs to August 1, 1999. This was only one of several leases held by Sapolin.

The Danbury lease presented certain unique problems, described by Jack Gross, Esq. of Stroock & Stroock & Lavan, attorneys for the debtor, at the hearing on the proposed sale of Sapolin's assets held on June 12, 1980:

"With respect to the Danbury property, I should point out that that property is currently occupied under a lease related to the debtors' development of a project in cooperation with the Connecticut De-

**5.** 11 U.S.C. § 365(b)(1) reads in its entirety:

"If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

"(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

"(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

"(C) provides adequate assurance of future performance under such contract or lease."

**6.** 11 U.S.C. § 365(f)(3) provides: "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." *Id.*

velopment Authority. Under the provisions of Federal Tax and Connecticut State Law, the Authority sold bonds to raise monies for the development of the project. The bonds were purchased by the Connecticut Bank and Trust Company. A lease was then entered into with Sapolin as lessee providing for a rental sufficient in amount to pay all charges in connection with the premises. The inducing factor to the Connecticut Bank and Trust Company in purchasing the bonds was that the interest income on the bonds under Federal Internal Revenue Service Regulations would not be taxable to the Bank. However, in order for that non-taxability feature to prevail during the term that the bonds are being paid off, there are certain restrictions and regulations that must be observed by the person acquiring the property if it be one other than the original lessee. Among other things, the Federal Tax Regulation requires that the substantial user of the facility shall not have expended in excess of $10,000,000 for capital improvements in Fairfield County, Connecticut during a fixed period." (Tr., 6/12/80, at 13–14.) (A typographical error and all incorrect lower case use have been corrected.)

The lease is Exhibit "A" to a claim which Connecticut Bank has filed against Sapolin in the amount of $1,434,035.07, of all of which the Court is taking judicial notice, as it advised the parties it would do. (Tr., 12/8/81, at 77.) The lease runs forty-five closely-typed pages, and no attempt will be made to summarize its provisions.

From the face of the lease, it appears that in the event the tax exemption is lost, Sapolin becomes liable for the full amount of the outstanding bonds at 109 percent of their face amount, plus accrued interest (Lease, § 6.5). (Sapolin's attorney estimated the potential liability under the lease to be around $1,400,000, which corresponds closely with the size of the claim filed by Connecticut Bank.)

The lease prohibits its assignment, or a sublease, without the written consent of the Connecticut Development Authority, which consent "shall not be unreasonably withheld" (§ 9.3). In the event of an assignment, the lessee remains liable to the Authority for the payment of all rent and for the full performance of all the other terms and conditions of the lease (*Ibid*). The lease includes an option to purchase (§ 8.1).

Although the filing of a petition for reorganization under the bankruptcy laws is a default under the lease (§ 7.1(c)), the lessee may sell all its assets in their entirety to another corporation, and thereafter dissolve, provided that the transferee corporation assumes in writing all the obligations to the lessee and has a net worth after such sale at least equal to, or greater than that of, the lessee immediately prior thereto (Lease, § 6.1).

### B. *The IFR Agreement*

The liquidation of Sapolin took place in two steps. The first step was the negotiation with International Fastener Research, Inc. ("IFR") of an agreement of sale of the assets of Sapolin and of its subsidiary, Woolsey, for $1,550,000. The second step was the actual sale of the assets to the highest bidder, which turned out not to be IFR.

The written agreement negotiated between IFR and the debtors is a complex document. In it, the lease with the Connecticut Development Authority is treated separately from the other Sapolin-Woolsey leases. It is not included among the leases listed in Schedule B, which the buyer agreed to assume at the closing pursuant to Paragraph 4(a)(i). Rather, Paragraph 11(d) committed the buyer only to sublease the Danbury Facility for not less than seven months, and Paragraph 12(d) committed Sapolin to enter into such sublease.

The Danbury Facility was the sole subject of Paragraph 17 of the Agreement, which contained three paragraphs all prefaced "Subject to the closing." Paragraph (a) committed the buyer to indemnify Sapolin up to $50,000 with respect to any claim paid out on account of the Danbury Facility; Paragraph (b) committed Sapolin, on request, to assign the Danbury lease to the

buyer, "subject to any consents to such assignment by the lessor or its assignee"; Paragraph (c) gave the buyer the right of first refusal on the purchase of the Facility.

### C. *The Hearing and Sale—June 12, 1980*

On June 12, 1980, pursuant to notice signed by the Court dated May 30, 1980, a hearing was held to consider the offer of IFR and to receive any higher or better offer. Notice of the hearing was sent all creditors and interested parties, including the Connecticut Bank. Present at the hearing were counsel for the debtor, for the Sapolin creditors' committee, the Woolsey creditors' committee, individual members of the creditors' committees, and for various creditors, both secured and unsecured, of the two debtors. Present also was counsel for the Connecticut Bank, John B. Nolan, and counsel for IFR and other interested persons.

At the hearing, Mr. Gross, the attorney for the debtors, announced that the terms of sale had been changed with respect to the Danbury Facility. Mr. Gross stated that IFR was exercising its option under Paragraph 17(b) of the Agreement to have the Danbury lease assigned to it, and was also removing the limitation in Paragraph 17(a) on its liability to indemnify Sapolin for any claim based on the Danbury lease. Explaining the change, Mr. Gross said:

"Under the terms of the purchase agreement, the purchaser had an option with respect to the Danbury property occupied by the debtors. I understand, and the attorney for the purchaser is here and will affirm to the Court that that option is exercised and as a result of its exercise, it will free the estate of an additional obligation in the approximate amount of $1,400,000." (Tr., 6/12/80, at 13.)

Later, he made clear that the indemnification limit "is eliminated and [the purchaser is] assuming the obligation of the lease." (*Id.*, at 28). Counsel for IFR affirmed that IFR "will take the property in Connecticut and assume the liability under the Connecticut lease (*Id.*, at 29).

IFR was willing to assume the lease because it had received, as Mr. Gross went on to state, informal assurance from the Connecticut Bank that it would be an acceptable purchaser:

"MR. GROSS: [attorney for Sapolin-Woolsey]: In anticipation of this hearing, the purchaser visited with the Connecticut Bank and Trust Company and was able to demonstrate that its taking over the lease would not, in any way, jeopardize the nontaxability of the interest payable on those bonds. Is John Nolan in Court?

"MR. NOLAN: Yes. That is correct, what you just said.

"MR. GROSS: And the Connecticut Bank and Trust Company has indicated that I.F.R. is an acceptable purchaser?

"MR. NOLAN: That is correct.

"MR. GROSS: Thank you. Mr. Nolan is the attorney for the Connecticut Bank and Trust Company." (*Id.*, at 14–15.)

The change in the terms of the proposed sale was very advantageous to the creditors of Sapolin and Woolsey, as Mr. Gitter, representing Sapolin's Creditors' Committee explained:

"As Mr. Gross adequately stated, this is going to be a liquidated plan. For, I would say, 2 or 3 days, the parties who were involved in the negotiations, including Mr. Angel's office and mine, [met] with the debtor and interested parties, [and] insisted that we be relieved completely of any obligation on the Danbury facility so as to obviously cut the claim which would be the denominator in the liquidating dividends of the creditors. After many hours of discussion with Mr. Cohen, who represents International Fasteners, we finally came up with this formula that we would accept a limited damage provision for the estate provided they would assume some of the damages, giving them the option to take over in the entirety our obligation and assume the Danbury lease, which they have indicated to you this morning they are now willing to do. As a result of which, unless a proposed purchaser assumes that obliga-

tion, the estate will suffer a claim which could, as Mr. Gross indicated, exceed $1,000,000, which could radically affect the liquidating dividend to general creditors in this case." (Tr., at 51–52.)

Explaining further, he added:

"I think now they have given us substantially more than they originally bargained for. If the damages were $1,000,-000, they agreed to indemnify us up to a $250,000 claim, figuring the dividend to creditors and the estate would probably be subject to a damage claim which could exceed $750,000. You have heard here this morning they are now willing to increase their offer, which they have a right to do under the contract, which would completely absolve the estate from any liability, which obviously increases the dividend to creditors in the event the Danbury facility is unrented and there is a claim against the estate.

"I think that is a very positive plus that anybody who comes in to competitively bid and we certainly hope there are competitive bids, must agree to that." (Id., at 52–53.)

Mr. Itzler, who represented the bidder which ultimately bought the Sapolin-Woolsey assets on behalf of its designee, Metropolitan, promptly announced that his client had no objection to making the same agreement as IFR because it was "interested in the Danbury facility." (Id., at 53.) At this juncture, the attorney for the Connecticut Bank interposed, as follows:

"MR. NOLAN: Mr. name is John Nolan from Day, Berry and Howard, representing Connecticut Development Authority and the Connecticut Bank and Trust Company as trustee. It may well be that Mr. Itzler's client would like to take over the lease. I don't know who they are, the bank has never obviously heard of them until this morning and it may well be that they may or may not be able to take it over, that depends. The Court should be aware of that.

"THE COURT: How long would it take to ascertain whether or not they could qualify?

"MR. NOLAN: Perhaps several days, your Honor.

"THE COURT: As long as several days?

"MR. NOLAN: Yes. There would have to be a credit investigation and certain other questions with respect to maintaining the tax free status of the bonds.

"THE COURT: But the tax free status depends upon capital investments.

"MR. NOLAN: Several factors, capital investments is one of them, which specifically knocks out or excludes people.

"THE COURT: That's right. Apart from that, the others are formal requirements[?]

"MR. NOLAN: That's a formal requirement, but there are other requirements that are satisfied by I.F.R. I am calling that to your attention." (Tr., at 53–54.)

When Mr. Itzler subsequently objected that IFR was receiving an unfair advantage in the bidding because it was assured of its acceptability to the Connecticut Authority, Mr. Miller, representing IFR, rose to clarify the record:

"MR. MILLER: Your Honor, I think that there has been a [distortion] of this issue in the context that the Connecticut Bank and Trust Company, as trustee, and the authority, Industrial Revenue Authority, have absolutely and irrevocably annointed I.F.R. I think if Mr. Nolan were asked, he would tell you what they have done is given a preliminary indication that that is the case and that there are a number of things to comply with law and the bond that have to be done before that authority or annointment is ratified and confirmed.

"MR. NOLAN: That's correct.

"MR. MILLER: There are hearings that have to be held as Mr. Nolan told me earlier. The reason I am rising is there seems to be a feeling here. We have done everything that we could do and we know where we are. We do, but it is not because Mr. Nolan's client or clients have said yes, you are fine, absolutely and irrevocably, because if we are not fine, we

are prepared to step in and take care of whatever the obligations are to the authority, to the Industrial Revenue Authority through the trustee. That is to say, we will buy the property and pay off the debt. That is our absolute and irrevocable and unconditional commitment and that is what we achieve by removing the $50,000 limitation and that is, in effect, a substantial improvement. We have made a higher and better offer by doing so and that is noticed in the notice that was sent out today.

"One final thing. That contract clearly contemplated that happening if we decided to elect the option to do so and nobody can come here today and say that the contract notice did not contemplate the assignment of that property to us upon the election to exercise the option which effectively eliminated the $50,000 limitation, because had we not done so, we would have been stuck with the $50,000 indemnity but without the property." (*Id.,* at 91–92.)

Mr. Lewis, counsel for the Woolsey Creditors' Committee, who had earlier suggested a brief adjournment of the auction to give Mr. Itzler's client time to confer with the Connecticut Bank, then queried Mr. Nolan directly as to what the purchaser had to do to be accepted as the designee of the lease:

"MR. LEWIS: Your Honor, may I ask a question of Mr. Nolan? The lawyer for the bank?

"THE COURT: Yes.

"MR. LEWIS: Mr. Miller has added some information that I think I was not aware of and that is that there is still some risk to I.F.R. if indeed they may not be able to assume the lease. I would be interested just in a sketch, if he can, of where I.F.R. stands in the process vis a vis the bank. In other words, if they have a risk and are willing to indemnify it and there is not a case where they have the bird in the bag, so to speak, then I think it is fair to impose that same risk on Mr. Itzler's client and I would withdraw my position [*sic*] of an adjournment.

\*　　\*　　\*　　\*　　\*　　\*

"MR. NOLAN: They have demonstrated to the bank that they are a company of means.

"MR. LEWIS: May I back up from that? Maybe where I got off on the wrong track is the impression that all you have to do is satisfy the bank.

"MR. NOLAN: No. The hearing, the Governmental bodies, the [A]uthority, State of Connecticut, there will be a hearing to consider the assumption of the lease.

"MR. LEWIS: If I may, your Honor, who has the authority to say yea or nay on that?

"MR. NOLAN: *The authority.*

"MR. LEWIS: Who is that?

"MR. NOLAN: *The officials in the State of Connecticut.*

"MR. LEWIS: And the bank has a role in that?

"MR. NOLAN: And the bank as the trustee and also in this case as the holder of the bond so under the papers, the mortgage and the lease, they have certain rights.

"MR. LEWIS: May I ask if the approval is discretionary with the State or if the numbers come out right anybody can assume that lease?

"MR. NOLAN: It is discretionary.

"MR. LEWIS: And the role of the bank vis a vis the State is your recommendation of any weight or import?

"MR. NOLAN: I would assume they would listen to the recommendation of the trustee." (Emphasis supplied; Tr., 6/12/80, at 93–94.)

Following this colloquy, former Bankruptcy Judge Lesser, who was present as counsel for one of the secured creditors, noted:

"that is it does not appear that anybody \* \* \* has really considered whether this type of problem is subject to resolution in accordance with Section 365(f) of the Code. There has been no suggestion here that the Danbury lease be assumed by the debtor. There has been no sugges-

tion here that the debtor attempt judicially to cause an assignment of that lease under the Code to a designated assignee and whether or not Mr. Itzler's client could furnish the type of adequate insurance [*sic*] that is required by the Code to justify such an assignment." *Id.*, at 96.

No one, however, followed up on this suggestion after it was urged that the delays attendant on a § 365 hearing would be fatal in view of the peculiar exigencies of the debtors. An immediate sale was necessary because Sapolin lacked money for its immediate operating expenses.

At this point, Mr. Itzler's client stated that it was agreeing to "accept the Danbury lease unconditionally." (Tr., at 98.) It agreed to buy on the same terms as IFR and to indemnify the creditors and the debtor against any loss in the Danbury situation (Tr., at 101).

After this concession by Mr. Itzler's client, the bidding began and concluded with Mr. Itzler's client making the successful bid of $2,600,001.

### D. *Post-sale Events*

On June 17, 1980, the sale of the debtors' assets to Metropolitan was approved by formal order of the Court. The same day, at the request of Connecticut Bank, Metropolitan's President, Anthony Petrocelli, accompanied by Sapolin's President, Frederick Kraemer, Jr., met with officials of the Connecticut Bank. At that meeting, Connecticut Bank requested information from Metropolitan relevant to the acceptability as the assignee of the Danbury Facility. The Connecticut Bank evidently requested additional information from Metropolitan, some of which was supplied on June 24, 1980, September 4, 1980, December 8, 1980, and December 18, 1980 (Metropolitan Exhibits 1, 2, 3, 9).

On July 7, 1980, Sapolin and Woolsey executed a Bill of Sale (Metropolitan Exhibit 10) transferring their assets to Metropolitan, and Sapolin executed a formal assignment of the Danbury lease. The assignment of the lease to Metropolitan was re-

corded in the office of the Danbury Land Records and the office of the Ridgefield Land Records on July 10, 1980 (Metropolitan Exhibit 8), and a copy was sent Connecticut Bank on December 18, 1980 (Metropolitan Exhibits 9–11).

The other leases included in the sale were handled differently from the Danbury Facility. With respect to those, Sapolin and Woolsey, on June 30, 1980, brought on a hearing on their right to assume and assign those leases pursuant to § 365 of the Code. As to all but one, the Court entered an order on July 7, 1980 authorizing their assumption and assignment. A similar order as to the remaining lease was entered on August 6, 1980 and forms the subject of the earlier opinion in this case dealing with § 365. *In re Sapolin Paints, Inc.*, 5 B.R. 412, 6 B.C.D. 776, 2 C.B.C.2d 854 (Bkrtcy.E. D.N.Y.1980).

In the letter sent the attorneys for the Connecticut Bank on December 18, 1980, Metropolitan's attorney volunteered that if a court order was necessary for the assignment to be approved, Sapolin had agreed to bring on a proceeding under § 365 (Metropolitan Exhibit 9).

On February 11, 1981, Connecticut Bank wrote Sapolin, Metropolitan, and the Connecticut Development Authority giving notice of various claimed defaults under the lease and under the indenture mortgage and trust issued the same date from the Connecticut Development Authority to the Connecticut Bank (Metropolitan Exhibit 5). The Bank claimed unpaid rent, unpaid taxes, and failure to provide duplicate copies of insurance agreements. In addition, it asserted defaults relating to Sapolin's failure to maintain minimum net worth and working capital, involvement in a reorganization proceeding, failure to supply audited financial statements at the close of each fiscal year, the purported assignment of a lease without the Authority's consent, and the transfer of all of Sapolin's assets to Metropolitan. The letter acknowledged that a check had been received from Metropolitan for the amount of the back rent, but was

being accepted "not as rent but as payment for use and occupancy of the Project."

In response to the letter of February 11, 1981, Metropolitan furnished the necessary certificates of insurance and cured all defaults, except those relating to Sapolin's insolvency, reorganization, and the sale and assignment of the Danbury Facility (Metropolitan Exhibit 4; Connecticut Bank Exhibit B). As to those, Metropolitan informed the Connecticut Bank it was requesting Sapolin to bring a proceeding under § 365. When Sapolin refused to do so on the ground that Connecticut Bank was estopped from asserting the need of an assumption and assignment proceeding (Sapolin Exhibit 1), the Connecticut Bank, in April, 1981, filed the application now before the Court.

Since the lease was assigned to Metropolitan by Sapolin, it has made five payments to Connecticut Bank: on August 23, 1980, February 4, June 5, July 27, and August 3, 1981 (Metropolitan Exhibits 6, 12, 13, 14, 15, 16). The first and third were accepted without protest; the second, fourth, and fifth have been accepted as payment for "use and occupancy" (Metropolitan Exhibits 5, 7). On August 11, 1981, Connecticut Bank wrote Metropolitan that neither the Connecticut Development Authority, nor Connecticut Bank, "recognizes that you have any rights whatsoever with respect to the property leased to Sapolin Paints, Inc." (Metropolitan Exhibit 7.) Metropolitan, in addition to paying the Connecticut Bank, has also paid taxes on the property totaling $49,115.25 (Metropolitan Exhibits 18, 19, 20).

On May 13, 1981, Connecticut Bank filed the proof of claim alluded to earlier herein wherein it claimed to be owed to that date the sum of $1,430,035.07, plus interest, taxes, insurance premiums, attorneys' fees, and costs. It claims priority for all lease payments unpaid since the filing of the petition.

At the request of Metropolitan and Sapolin, evidence has been received, and hearings on the Bank's application were held on July 16 and December 8, 1981. Thereafter, briefs were filed.

Connecticut Bank urges that Sapolin's lease with the Connecticut Development Authority was never assumed, nor assigned, in accordance with § 365, and it has therefore been denied due process. It contends that § 365 requires that it be given adequate assurance of future performance, which has not been, and cannot be, done. Both Sapolin and Metropolitan urge that § 365 has been satisfied, but that, in any event, Connecticut Bank is barred by both laches and estoppel from contending otherwise.

## DISCUSSION

As the Court of Appeals observed in a matter having some points in common with the present proceeding, this case is "a troublesome one." *In re R. Hoe & Co., Inc.*, 508 F.2d 1126, 1129 (2d Cir. 1974). It is troublesome for several reasons: first, the section of the Code which is involved is new and its exact contours are not yet known; second, Connecticut Bank has adopted a curious procedure for challenging the right of Metropolitan to be recognized as the assignee of the lease of the Danbury Facility, a procedure that appears simultaneously to invite and avoid a determination of that issue. All that is before the Court is a six-line application requesting the Court to establish a timetable for the assumption or rejection by Sapolin of its lease of the Danbury Facility.

That substantial issues are potentially involved is indicated by the million-dollar-plus claim filed by the Connecticut Bank against Sapolin. But the claim, like the application, provides scant information respecting what lies behind these procedural demarches, or why the Connecticut Bank is apparently unwilling to accept Metropolitan as a successor to Sapolin as the lessee of the Danbury Facility. For the reasons set out hereinafter, this Court has concluded, not without difficulty, that the Connecticut Bank has waited too long to deny that Sapolin, to the extent that it had the power under the lease with the Danbury Facility to do so, has both assumed and assigned that lease. It may be that under the terms of that

lease, the Connecticut Bank need not accept Metropolitan as an assignee, but under well-established equitable principles, it cannot challenge the assignment by Sapolin to Metropolitan on procedural grounds predicated on § 365.

In point of fact, the application of Connecticut Bank makes no reference to the assignment to Metropolitan, or to anyone else. It focuses exclusively on assumption of the contract by Sapolin. Ignoring all that has taken place since June 12, 1980, the Connecticut Bank requests that a date be fixed for Sapolin to assume or reject a lease it has long since assigned.

■ In terms of the narrow issue presented for decision by the application, the short and complete answer is that it would be a work of supererogation to fix a date for Sapolin to assume or reject the lease of the Danbury Facility because that lease was assumed no later than July 7, 1980 when Sapolin assigned it to Metropolitan. Assignment presupposes assumption. *In re Avery Arnold Construction Inc.*, 11 B.R. 34, 35 (Bkrtcy.S.D.Fla.1981); *Matter of Zacherl Coal Co., Inc.*, 14 B.R. 1001 (Bkrtcy. W.D.Pa.1981).

There can be no question but that under § 70b of the Bankruptcy Act (former 11 U.S.C. § 110(b)) far less has been held sufficient to show assumption of an executory contract by a bankruptcy trustee. "An assumption may be shown by word or by deed consistent with the conclusion that the trustee intended to assume." *In re Steelship Corp.*, 576 F.2d 128, 132 (8th Cir. 1978). *See Nostromo, Inc. v. Fahrenkrog*, 388 F.2d 82, 84–85 (8th Cir. 1968); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1007 (3d Cir. 1973). Indeed, assumption was found solely on the failure to affirmatively reject a leasehold and the expenditure of money on its maintenance. *In re Huntington Ltd.*, 654 F.2d 578 (9th Cir. 1981). *Cf. Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164, 170 (2d Cir. 1975), *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975), *and cert. denied sub nom. Int'l Ass'n of Machinists & Aerospace Workers v. REA Express, Inc.*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976).

Following these pre-Code cases, the court, in *Matter of Zacherl Coal Co., Inc.*, 14 B.R. 1001 (Bkrtcy.W.D.Pa.1981), held that a confirmation of a private sale of all the assets of the debtor, including a lease, satisfied § 365. The bankruptcy court said: "The affirmative action of the trustee in petitioning to sell the lease and remaining coal in a proceeding confirmed by the Court * * * operated as a final and complete assumption of the executory lease and contract and that no further action was required to establish said items as assets [*sic*] the estate." 14 B.R. at 1001–02.

In *In re Avery Arnold Construction Inc.*, *supra*, a Chapter 7 proceeding, the bankruptcy court also found a timely assumption of a lease on the basis of acts inconsistent with any other result. First, the trustee's attorney had advised the landlord's attorney within the 60-day period that he intended to assign the lease to a designated third party and had requested a letter approving the proposed assignee. The court held that such oral notice of intention to assume was sufficient. Further, the court said that "the application for leave to assign the lease, which has been duly noticed to all creditors * * *," and which was then pending, could properly be treated as "also requesting approval of the assumption of the lease. The former [the assignment] necessarily presupposes the latter. On that premise, I approve the assumption of the lease." 11 B.R. at 35.

■ It is true that the Code, unlike the Act, requires that the assumption of a contract receive the approval of the bankruptcy court, but that approval may be manifested in a variety of ways.

*In re R. Hoe & Co., Inc.*, *supra*, is instructive in this connection. Section 116(1) (11 U.S.C. § 516(1)) of the Bankruptcy Act, which was involved in that case, provided that a judge could "[p]ermit the rejection of executory contracts of the debtor * * * upon notice to the parties to such contracts and to such other parties in interest as the

judge may designate." This was a requirement for Court approval of the rejection of a contract not too different from that now contained in § 365(a) respecting assumption. The rejection of an executory contract pursuant to that section gave rise to a claim under § 202 of the Act (11 U.S.C. § 602). In that case, the trustee in a Chapter X proceeding objected to recognition of a claim for damages based on the rejection of an executory contract on the ground that the procedure required before a contract could be deemed rejected had not been followed. The debtor there involved had agreed to complete its outstanding executory contracts in return for the payment of a premium over the contract price. One of the parties to the contracts renegotiated in this fashion argued that the refusal of the debtor to carry out the contract was a breach entitling it to damages, to which the trustee replied that in a Chapter X proceeding, "the prerequisites to a successful claim for a breach of an executory contract are express rejection following a hearing on notice to the parties and permission of the court to reject. None of these elements, according to the trustee, is present here." 508 F.2d at 1130. The Court of Appeals held otherwise, saying:

"It is true that judicial action is necessary for rejection of an executory contract in a Chapter X proceeding, and that the formalities must ordinarily be complied with. But the record of these proceedings discloses an in-court coalescence of repudiation by the trustee with approval by the court. * * * While the trustee occasionally said he was not rejecting the original contracts, the effect of what was happening was precisely that. The court obviously gave its blessing to the increases in contract price, and authorized the trustee to give priority to completing the work under the new arrangements. We believe that this satisfied the requirements of sections 116 and 202 of the Bankruptcy Act that the court 'permit' the rejection of an executory contract." (Footnotes and citations omitted.) *Id.*

■ Similarly, in this case, when the bankruptcy court signed the Order of June 27, 1980 sanctioning the transfer to Metropolitan of all the assets of Sapolin, including the Danbury lease, in accordance with the IFR Agreement as modified on the record on June 12, 1980, it necessarily approved the assignment, and therefore, the assumption of the lease, by Sapolin.

Connecticut Bank urges, however, that the pre-Code cases are no longer controlling, and that there could be no assumption of the Danbury Facility by the debtor and no approval of such assumption by the bankruptcy court until Connecticut Bank received adequate assurance of future performance. In essence, Connecticut Bank is making a collateral attack on the court's implicit approval in the order of June 27, 1981 of Sapolin's assumption of the lease on the Danbury Facility.

■ As a matter of substance, Connecticut Bank has presented no evidence, although it had the opportunity to do so, that the lease on the Danbury Facility was in default on January 12, 1980, requiring Sapolin to furnish adequate assurance of future performance under 11 U.S.C. § 365(b). If the lease was not in default, Sapolin was entitled to Court approval, absent extraordinary circumstances, as a matter of course under 11 U.S.C. § 365(a). *In re Summit Land Co.*, 13 B.R. 310, 315, 7 B.C.D. 1361, 1364, 4 C.B.C.2d 1431, 1437 (Bkrtcy.D.Utah 1981). *Cf. In re Alexander*, 670 F.2d 885 (9th Cir. 1982).

■ As a matter of procedure, satisfaction of 11 U.S.C. § 365(b), even where an unexpired lease is in default, does not necessarily require a hearing followed by a formal determination. Assumption of an unexpired lease may be part of a Chapter 11 plan. 11 U.S.C. § 1123(b)(2): "A plan may—(2) subject to 365 of this title, provide for the assumption * * * of any * * * unexpired lease * * *." But as Bankruptcy Judge Mabey has noted, although the "plan is confirmed with judicial oversight * * * the acceptance or rejection of contracts is not approved in the sense contemplated by section 365(a)." *In re Summit Land Co., supra*, 13 B.R. at 314, 7 B.C.D. at 1363, 4

C.B.C.2d at 1437. The proposed new Bankruptcy Rules recognize these different procedural roads to the same result by providing for a contested proceeding to an unexpired lease only where such assumption is not part of a plan. Proposed Rule 6006.

■ If assumption of an unexpired lease as part of a plan, confirmed by the Court, is consistent with the requirements of § 365, equally should assumption of an unexpired lease as part of a sale approved by the Court be consistent therewith. If one satisfies due process, so equally does the other.

All that § 365(a) requires is that an unexpired lease be assumed, and that assumption have the approval of the Court. The pre-Code cases retain sufficient vitality to stand as authority that there was both assumption by Sapolin of the Danbury lease, and approval of such assumption by the Court. The facts constituting such assumption and assignment were known to Connecticut Bank for over nine months before it filed the pending application.

■ Connecticut Bank had the opportunity to be heard and to object to the order approving the sale; it made no objection. Its present objections nine months later come too late. Connecticut Bank's long acquiescence in Sapolin's assumption of the Danbury lease with the Court's approval waived any defects in procedure. So far as § 365(a) is concerned, its requirements have been satisfied. Sapolin has assumed the lease of the Danbury Facility and has done so with the approval of the Court. The lease of the Danbury Facility having been assumed by Sapolin, the application of Connecticut Bank to fix a time for Sapolin to do what it has already done must be denied.

Perhaps this Opinion should stop at this point, since the application filed by Connecticut Bank goes no further. But all the parties appear to have invited consideration by the Court of the effect of § 365 on the assignment of the Danbury Facility to Metropolitan.

Section 365(f), which governs the assignment of unexpired leases in a Title 11 proceeding, gives the nondebtor contracting party certain new rights but takes other rights away. He is given assurance of future performance, but in return he loses the control his contract or statute otherwise gives him over the nature of the assignee. *See* Fogel, "Executory Contracts and Unexpired Leases in the Bankruptcy Code," 64 *Minn.L.Rev.* 341, 364 (1980). *Cf. Matter of U. L. Radio Corp.*, 19 B.R. 537 (Bkrtcy.S.D. N.Y., 1982).

The assurance of future performance, made a condition to assignment under § 365(f)(2), is not necessarily the same as the rights given the nondebtor contracting party by his contract to control assignment. It may be more, or it may be less. Therefore, invocation of § 365 may well result in depriving the contracting nondebtor of the right to demand strict enforcement of contractual clauses limiting assignment, directly or indirectly.

At the June 12 hearing, Sapolin acquiesced in the position of the Connecticut Bank that the assignment should take place in accordance with the provisions of the lease itself, rather than under the compulsion of § 365. At that hearing, Connecticut Bank clearly indicated that it would consent to the assignment of the lease of the Danbury facility, provided the lessor satisfied "the Governmental bodies, the [A]uthority, State of Connecticut," and that the body that would make the final determination consisted of the officials of the State of Connecticut comprising the Authority. Indeed, the Connecticut Bank had already informally indicated to IFR that it would be acceptable as assignee. Its position was that it was insisting on its rights under the lease to approve the assignee. But invocation by Sapolin of the procedures authorized by § 365(f)(2)(B) would have nullified the contractual restrictions which Connecticut Bank was invoking. Thus, Connecticut Bank was insisting on a right inconsistent with the statutory scheme.

The discussion of Sapolin's potential liability on the Danbury Facility occupied most of the June 12 hearing. The potential liability in connection with that lease was central to all that took place at that hear-

ing. The position taken by the Connecticut Bank was critical, as were the statements on the record by its representatives in response to the inquiry by Sapolin's creditors. It was only after Connecticut Bank's representative stated on the record as to how and by whom the acceptability of any assignee would be determined that Metropolitan agreed to bid on the same terms as IFR, and the bidding proceeded. It is hornbook law that rights may be waived or lost by estoppel:

> "Where a person tacitly encourages an act to be done, he cannot afterwards exercise his legal right in opposition to such consent, if his conduct or acts of encouragement induced the other party to change his position, so that he will be pecuniarily prejudiced by the assertion of such adversary claim." *Swain v. Seamens,* 9 Wall. 254, 274, 19 L.Ed. 554 (1869).

*Accord: Dickerson v. Colgrove,* 100 U.S. 578, 580, 25 L.Ed. 618 (1880); *Feldman v. Trans-East Air, Inc.,* 497 F.2d 352 (2d Cir. 1974).

In viewing the actions of the parties, the Court is mindful of the fact that it exercises "the powers of a court of equity, law and admiralty * * *." 28 U.S.C. § 1481. As a court of equity, this Court must apply equitable principles.

At the June 12 hearing, the Connecticut Bank took the position that it was going to rely on its rights under its contract to approve, or disapprove, as assignee the successful bidder for the Sapolin assets. That insistence was inconsistent with the acceptance of any assignee, regardless of the contract, pursuant to an assignment under the compulsion of § 365(f)(2).

Equally importantly, Sapolin's creditors acquiesced in the insistence of Connecticut Bank on its contractual rights and forewent invocation of § 365 in the interests of expedition. What Connecticut Bank insisted upon, and what it got at the June 12, 1980 hearing, was acquiescence in performance of the lease of the Danbury Facility in accordance with its terms with reference to its assignability.

Not only did Connecticut Bank take the position that approval of the assignee was the responsibility of itself and the other Connecticut authorities alone, but that continued to be its position for months following the sale while Metropolitan paid the rentals due under the lease, paid the taxes on the property, and supplied the information the Connecticut Bank required.

Only most belatedly, for reasons which Connecticut Bank has never elected to disclose, has the Bank asserted that the assignment should be tested under the Code and by the bankruptcy court, rather than by the terms of the lease and by the Connecticut authorities.

This change in position comes too late. Sapolin, Sapolin's creditors, and Metropolitan have all relied on the Connecticut Bank's apparent waiver of both the benefits and liabilities of § 365(f). Metropolitan bid on that basis and Sapolin, with the consent of its creditors, accepted its bid. Metropolitan has paid out substantial sums in rent and taxes in reliance on the assignment to it subject to the rights of Connecticut Bank under the lease. Metropolitan, Sapolin, and Sapolin's creditors would all be seriously prejudiced were Connecticut Bank now permitted to change its position nine months later and demand that not the lease, but § 365(f), control the assignment of the Danbury Facility.

The Connecticut Bank, with notice and knowledge of both the assumption by Sapolin of the lease, and its assignment to Metropolitan, thereafter accepted the payment of rent from Metropolitan. Only after a payment was received without objection was a subsequent payment unilaterally denominated as paid for use and occupation. The acceptance of such rent may now bar Connecticut Bank from denying Metropolitan the status of an assignee under the lease. *In re Sound, Inc.,* 171 F.2d 253 (7th Cir. 1948), *cert. denied sub nom. Atwell Bldg. Corp. v. Sound, Inc.,* 336 U.S. 962, 69 S.Ct. 892, 93 L.Ed. 1114 (1949); *In re Wil-Low Cafeterias, Inc.,* 111 F.2d 83, 86 (2d Cir. 1940); *Tuttle v. Martin,* 32 Conn.Supp. 297,

352 A.2d 321 (Conn.C.P.1975); *Hartford Wheel Club v. Travelers' Ins. Co.*, 78 Conn. 355, 62 A. 207 (1905); 49 Am.Jur.2d, Landlord and Tenant § 421 (1970), at 430–31.

At the very least, however, acceptance of such rents reinforces all the other grounds for deeming Connecticut Bank estopped from challenging the assignment by Sapolin of the Danbury Facility to Metropolitan on grounds derived from § 365(f)(2).

It is clear beyond peradventure that the omelette cannot be unscrambled or the clock rolled back. The auction cannot be re-held; Sapolin's assets are gone, the money has been paid over. Connecticut Bank chose its rights under the lease over the assurance of future performance available to it under § 365(f)(2). It is too late now for it to alter its election. Connecticut Bank has received the full benefit of its bargain. As Sapolin has urged, Connecticut Bank is receiving full performance of the contractual obligations for which it bargained; it is being permitted to test the assignment to Metropolitan in accordance with the terms of its contract.

For the foregoing reasons, its application is denied.

An Order consistent with this Opinion is being entered contemporaneously.