**In re BALCO EQUITIES LTD, INC., Haddon Holdings Ltd., Sarah Enterprises International Ltd., Debtors.**

No. 04–35777(CGM).

United States Bankruptcy Court, S.D. New York.

March 17, 2005.

Mark D. Glastetter, Deiley, Mooney & Glastetter, LLP, Albany, NY, for Chapter 7 Trustee, Paul L. Banner.

Michael L. Carey, Jacobowitz & Gubits, LLP, Walden, NY, for Epic Orange, L.L.C.

Michael J. Matsler, Rider, Weiner, Frankel & Calhelha, P.C., New Windsor, NY, for Antonina Gibney–Campbell, Estate of Frederic J. Warmers.

Elizabeth A. Haas, Barr & Haas, LLP, Spring Valley, NY, for Donald P. Boehm.

Jennifer L. Saffer, Pick & Saffer, LLP, New York City, for Upstate Properties, LLC.

Kevin J. Licciardi, McCarter & English, LLP, Newark, NJ, for Hudson United Bank.

CECELIA MORRIS, Bankruptcy Judge.

On March 15, 2005 this Court heard argument on the Chapter 7 Trustee's "Motion for Sale of Real Property Pursuant to 11 U.S.C. § 363(b) and Renewed Motion for an Order Rejecting Contract of Epic Orange, L.L.C. Pursuant to 11 U.S.C. § 365(a)." (ECF Docket No. 255) The Court authorized the Chapter 7 Trustee (the *"Trustee"*) to sell property owned by the Debtor to Upstate Properties, LLC (*"Upstate Properties"*), for the sum of $1.5 million in cash or certified funds, and authorized the rejection of a pre-petition contract of sale, between Balco Equities (*"Balco"* or "Debtor") and Epic Orange, L.L.C. (*"Epic Orange"*) for the same property. In so ruling, the Court considered numerous pleadings, including:

— "Objection to Motion for Sale of Property By Trustee" and Memorandum of Law, filed on behalf of Antonina Gibney–Campbell, Estate of Frederic J Warmers (*"Warmers"*) (ECF Docket Nos. 259 and 275);

— "Opposition to the Trustee's Motion Seeking to Reject the Contract between Balco Equities Limited, Inc. with Epic Orange, LLC Objection to Proposed Sale and To Compel Enforcement of the Epic Orange Contract," filed on behalf of Epic Orange (ECF Docket No. 261); "Affidavit of David Weinberg in Opposition to Motion to Reject the Epic Orange Contract," filed on behalf of Epic Orange (ECF Docket Nos. 265 and 271); "Supplemental Objection to Motion by Trustee to Reject Epic Orange Contract," (ECF Docket No. 282);

— "Motion of Epic Orange Requesting the Court to Abstain Pursuant to 28 U.S.C. Section 1334(c) and 11 U.S.C. Section 305 and to Vacate the Automatic Stay Pursuant to 11 U.S.C. Section 362" and Memorandum of Law, (ECF Docket Nos. 283 and 284); "Supplemental Submission of Epic Orange in Support of Epic Orange's Motion to Abstain, to Obtain Relief from the Automatic Stay, and in Opposition to Trustee's Motion to Sell Real Property" (ECF Docket No. 296);

— "Memorandum of Law in Support of Objection of the Trustee to Motion of Epic Orange Requesting Abstention and Vacation of the Automatic Stay" (ECF Docket No. 286);

— "Opposition to Epic Orange's Motion to Abstain," filed on behalf of Warmers, and Memorandum of Law (ECF Docket Nos. 288 and 290); and

— "Opposition to Motion for Sale of Property," and Memorandum of Law filed on behalf of Donald P. Boehm (ECF Docket Nos. 262 and 277).

In addition, and in an effort to give full consideration to the merits of the opposition of Epic Orange, the Court considered the following pleadings submitted by Epic Orange in opposition to the previous motion of the Debtor-in-possession to reject

the Epic Orange Contract [1]:

— Motion and Memorandum of Law "in Support of Motion of Epic Orange, LLC Seeking Entry of an Order—Denying the Rejection of the Epic Orange, LLC Contract Dismissing the Case as Being Filed in Bad Faith, Converting the Proceeding to a Chapter 7 and having a Trustee Appointed, and for such other and further relief as the Court deems appropriate" (ECF Docket Nos. 118 and 122);

— "Objection of Epic Orange, LLC to the Motion of Balco Equities Ltd, Inc., for an Order Extending Time to File Motion to Reject Executory Contract Nunc Pro Tunc Pursuant to Fed. R. Bank. Pro 9006(b)(1)" (ECF Docket No. 159); and

— "Memorandum of Law in Opposition of Motion to Reject Epic Orange Contract," (ECF Docket No. 233).

## JURISDICTION

This Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. Matters concerning the administration of the estate, and motions for an order approving sale of estate property are "core proceedings" under 28 U.S.C. § 157(b)(2)(A) and (N).

## BACKGROUND

Debtor filed this Chapter 11 case on March 31, 2004. The case was converted to Chapter 7 on December 14, 2004 (ECF Docket No. 248), and the Trustee was appointed in the case.

Other than ownership of the shares of Haddon Holdings, Ltd. (a co-debtor), the sole asset of Balco is 71.9 acres of vacant land in New Windsor, N.Y. (the "*New Windsor Property*"). The estimated value, as listed in Debtor's amended petition (ECF Docket No. 53) is $2 million. It is shown as encumbered by a secured claim of $1.1 million.

Pursuant to an agreement with Epic Orange, L.L.C. dated April 17, 2003, the Debtor contracted to sell the property to Epic Orange for $1.1 million (with a possible price adjustment if Epic Orange received approval to build more than 110 units on the property; in that case, the purchase price would have been the number of units multiplied by $10,000). (ECF Docket No. 255, Exhibit B) Epic Orange intended to obtain, at its own cost and expense, "final subdivision approval such as will enable [Epic Orange] to obtain building permits to commence construction on the [New Windsor Property] for active adult single family dwellings." Epic Orange paid a $10,000 deposit at the time of the agreement and agreed to pay an additional $20,000 following a 60–day due-diligence period. Epic Orange originally was given a total of 20 months to obtain the necessary approvals, which period could be extended by six to twelve months by paying additional consideration of $25,000 to $75,000.[2] Counsel for Debtor in negotiating the Epic Orange Agreement, Cohen Estis & Associates, originally served as Debtor's bankruptcy counsel.

From the very outset of this case, the Debtor indicated that it intended to reject the Epic Orange contract so that the New

---

1. The Debtor-in-possession's motion to reject the Epic Orange Contract was denied without prejudice, without considering the merits (ECF Docket No. 239).

2. Although these payments of $25,000 and $50,000 are described as consideration in Section 6(h) of the contract, they are apparently characterized as "deposits" later in the same paragraph.

Windsor Property could be sold to a higher bidder. An earlier contract was represented as an "initial contract offer" to purchase the New Windsor Property "for cash at closing of $1.6 million, without contingencies with a proposed closing date within 90 days," but this was later revealed to be a mere *option* contract, unsigned, and containing many contingencies, including a contingency that the buyer's proposed development project be approved by the town of New Windsor and could be supported by the existing water system. (*See* July 9, 2004 decision on motion of Hudson United Bank for relief from stay, ECF Docket No. 112, reported as *In re Balco Equities Ltd.*, 312 B.R. 734, 744 (Bankr. S.D.N.Y.2004)) There was evidence presented at that time that the proposed purchaser, Golden Triangle, was an entity formed by the Cohen Estis firm.

The Debtor next sought to reject the New Windsor Property in favor of a sale to an individual known as Aric Valdman by contract of sale dated June 14, 2004, for $1,450,000. On November 23, 2004, the Court signed an order denying that motion after Valdman repeatedly failed to disclose financial information (ECF Docket No. 239).

On July 16, 2004, prior to conversion of the case to Chapter 7, the Debtor-in-possession stipulated with Hudson United Bank ("*Hudson*") to allow the automatic stay to be lifted regarding the New Windsor Property, but providing that no foreclosure complaint would be filed before September 15, 2004. (ECF Docket No. 158) Thereafter, Hudson commenced fore-closure proceedings in state court, and Epic Orange and Warmers have been joined as parties in the foreclosure proceeding.

Upon conversion of the case to Chapter 7, the Trustee brought the current motion, renewing the Debtor's prior motion to reject the Epic Orange Contract in favor of a sale of the New Windsor Property to Upstate Properties for $1.5 million in cash, without warranty and with "minimal contingencies."[3] The Trustee estimates that the sale to Upstate Properties will yield $330,000 to the estate for payment of administrative expenses and claims of unsecured creditors. The remaining sales proceeds will repay: (1) the $1.1 million mortgage held by Hudson, and (2) estimated unpaid school, town and county property taxes for 2003, 2004 and 2005 of $70,000. The Trustee does not propose to pay the mortgage in favor of Frederic J. Warmers and Warmers Construction Corp. dated November 22, 1989 in the sum of $1,420,000 (the "*Warmers Mortgage*"). The Trustee explains that "The Warmers Mortgage is no longer a valid lien upon the Balco Property, since, pursuant to [New York Civil Practice Law and Rules] 213, subsection 4, no action appears to have been commenced within six (6) years of its maturity."

On February 2, 2005, the Trustee commenced an adversary proceeding against the Executrix of the Warmers Estate, seeking to void interests in the New Windsor Property pursuant to 11 U.S.C. § 544(a)(3)[4] and objecting to Warmers'

---

**3.** The Debtor's initial motion to reject the Epic Orange Contract was intertwined with the motion to sell the New Windsor Property to Valdman. When the Court denied the motion to sell the property to Valdman, the Debtor's motion to reject was also denied without prejudice.

**4.** Under Section 544(a)(3), setting forth the Trustee's "strong arm" powers, the Trustee takes, as of the commencement of the case, the rights and powers of a bona fide purchaser of real property from the debtor. Under New York law, a bona fide purchaser takes free of unrecorded interests in real property. New York Real Property Law § 291.

proof of claim (Adv. Proc. No. 05–9005; hereafter, the *"Warmers Adversary Proceeding"*). Warmers filed an answer and counterclaims, including a claim to impose a constructive trust on the New Windsor Property. The Trustee has answered the counterclaims, raising defenses of laches, release, res judicata, statute of limitations, and waiver to Warmers' counterclaims.

The Trustee argues that the Epic Orange Contract was "deemed rejected" under Section 365(d)(1) on February 14, 2005. The Trustee nevertheless sought rejection of the Epic Orange Contract because he originally intended to consummate a sale to Upstate Properties prior to February 14, 2005. (ECF Docket No. 255, ¶ 18)

## DISCUSSION [5]

### I. Objections to Sale of the New Windsor Property

#### A. Warmers' Objections

Warmers contends that the New Windsor Property "was fraudulently conveyed" and "otherwise fraudulently converted" in June 2002, and that Warmers "is the true and rightful owner of the real property, and that the debtor has no valid legal interest therein." (ECF Docket No. 259, ¶ 1)

The following is a brief summary of Warmers' factual allegations [6]:

— Frederic J. Warmers died on December 30, 1998. The estimated value of his real property at that time exceeded $6 million. Mr. Warmers created several trusts naming beneficiaries, including his granddaughter, and his daughter, Antonina Warmers. The trusts owned valuable income generating commercial property, and the beneficiaries were entitled to current income and eventual title. Boehm is a cousin of Mr. Warmers. He was appointed executor and also acted as the trustee of the trusts.

— Before Boehm was removed as executor in November 2003, Warmers alleges that he "systematically looted" Mr. Warmer's estate as well as the trusts, by selling property or notes and having the proceeds conveyed directly to companies he owned or controlled, including Balco and Haddon Holdings, Ltd.

— In 1989 Mr. Warmers and his company, Warmers Construction Corp. conveyed the New Windsor Property to a limited partnership known as Foxwood Associates (*"Foxwood"*), and took back a mortgage which was filed in Orange County and does not specify any maturity date. This is the Warmers Mortgage that the Trustee seeks to avoid.

— In July 1999, Boehm, acting as fiduciary for Warmers, commenced a proceeding to foreclose on the mortgage and regain possession of the New Windsor Property from Foxwood. In June 2002, Foxwood Associates gave Boehm a deed to the New Windsor Property, identifying the grantee as Balco (rather than Warmers). Boehm used funds from Warmers to make partial payment to Foxwood, and Foxwood waived the balance of a $1.4 million loan, provided that Foxwood conveyed the New Windsor Property to Balco. Boehm then took out a mortgage on the New Windsor Property from Hudson in exchange for a $1.2 million loan.

(ECF Docket No. 259, ¶¶ 3–9)

Warmers requests that the Trustee's motion be denied or adjourned pending the outcome of Warmers' Adversary Proceeding.

---

**5.** The following constitute the Court's findings of fact and conclusions of law under Bankruptcy Rules 9014 and 7052.

**6.** These allegations do not constitute findings of the Court.

■ The Trustee can sell the New Windsor Property prior to resolution of the Warmers' Adversary Proceeding, pursuant to 11 U.S.C. § 363(f)(4), which provides that the trustee may sell property free and clear of any interest in such property if "such interest is in bona fide dispute." In this case, the proceeds of sale will be held in escrow until the Warmers Adversary Proceeding is resolved, so that whatever lien Warmers may have against the New Windsor Property will not be prejudiced.

Nor does the counterclaim asserting a constructive trust require a different outcome, because the constructive trust is itself the subject of a bona fide dispute. "Courts have permitted the sale of property free and clear of constructive trust claims or equitable liens, so long as they attach to the proceeds of sale." *In re DVI, Inc.,* 306 B.R. 496, 504 (Bankr.D.Del. 2004) (Chapter 11 debtors could sell personal property in which third party claimed constructive trust interest where interest had not been adjudicated by court as of petition date and was subject to bona fide dispute, where third party could be protected by having whatever interest it possessed attach to sales proceeds).

**B.** *Epic Orange's Objections* [7]

**1.** *Motion to Abstain*

■ Epic Orange asks this Court to abstain under 28 U.S.C. § 1334(c).[8] Epic

Orange argues that abstention is appropriate because Hudson has obtained relief from the stay to foreclose its mortgage interest against the New Windsor Property and has commenced a foreclosure action to which Epic Orange has been joined. Epic Orange accordingly asks the Court to abstain on both "permissive" grounds in Section 1334(c)(1) and "mandatory" grounds in section in (c)(2). The Trustee and Warmers oppose the motion to abstain.

■ "Permissive abstention from core proceedings under 28 U.S.C. § 1334(c)(1) is left to the bankruptcy court's discretion." *In re Petrie Retail, Inc.,* 304 F.3d 223, 232 (2d Cir.2002).

In determining whether to exercise permissive abstention under § 1334(c) courts have considered one or more (not necessarily all) of twelve factors: (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to

---

7. Epic Orange withdrew its objections based upon notice and service at the March 15, 2005 hearing.

8. Section 1334(c) states:

(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the court's] docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

*In re Cody, Inc.*, 281 B.R. 182, 190–91 (S.D.N.Y.2002) (McMahon, J.) (citation omitted) (alteration in original). Several of these factors are relevant in this case. First, abstention will certainly effect efficient administration of the estate. Second, although state law issues exist, there is at least an equal measure of bankruptcy issues. The Court will not abstain under the permissive section where sale to a higher bidder would, in the Trustee's business judgment, result in benefit to the estate. Far from being unrelated or remote from the bankruptcy case, the New Windsor property is the primary focus of the bankruptcy case, invoking several substantial core proceedings under 28 U.S.C. § 157(b)(2). For these reasons, and because the Court does not believe that "the interest of justice" or "the interest of comity with State courts or respect for State law" requires abstention, Epic Orange's motion to abstain under 28 U.S.C. § 1334(c)(1) is denied.

■■■ Mandatory abstention applies where the proceeding in question is (1) "related to a case under title 11," rather than "arising under title 11," and where (2) the proceeding is commenced and can be timely adjudicated in a state forum. "Abstention is only mandated with respect to non-core matters.... Therefore, where a

matter constitutes a core proceeding, the mandatory abstention provisions of section 1334(c)(2) are inapplicable." *In re Petrie Retail, Inc.*, 304 F.3d at 232 (citation omitted).

The issues before this Court concerning Epic Orange and the Epic Orange Contract involve various core proceedings, including the determination of the validity, extent or priority of liens under 28 U.S.C. § 157(b)(2)(K), orders approving the sale of property under 28 U.S.C. § 157(b)(2)(N), and "other proceedings affecting the liquidation of the assets of the estate" under Section 157(b)(2)(O). A proceeding to reject an executory contract arises under title 11 U.S.C. § 365. Epic Orange has cited no cases where a court has been obligated to abstain under these circumstances.

More significantly, mandatory abstention under Section 1334(c)(2) is required only "upon timely motion of a party in a proceeding ...." As the Trustee observes, the issue of rejection of the Epic Orange contract has been pending in this court since at least July 2004, and Epic was made party to the state foreclosure action in October 2004, yet Epic Orange did not raise the abstention issue until January 21, 2005, and did not make a separate motion until February 15, 2005. Under the circumstances, the Court agrees with the Trustee that the request for abstention is not timely. *See In re AHT Corp.*, 265 B.R. 379, 384 (Bankr.S.D.N.Y.2001) (defendants' motion to abstain not timely when filed some 2–1/2 months after complaint and one day before defendants' long-extended deadline to answer, and where defendants had already "utilized the substantive process" of court "on a matter going to the merits"); *see also In re Waugh*, 165 B.R. 450, 452 (Bankr.E.D.Ark.1994) (denying motion to abstain as untimely when filed nearly four months after complaint).

### 2. *Motion for Relief From Stay*

■ For similar reasons, Epic Orange asks the Court to lift the automatic stay to allow the state foreclosure action against the New Windsor Property to proceed because it is "not likely that there will be anything for the Debtor's estate." (ECF Docket No. 283, ¶ 9) Both the Trustee and Warmers have objected to Epic Orange's motion for relief from the automatic stay. Warmers opposes the motion for relief from the automatic stay because proceeding concurrently in state court would "result in inconsistent or conflicting judicial decisions and would not be conducive to judicial economy, and could unfairly prejudice the Warmers Estate; and would therefor [sic] not be in the best interests of the debtor or creditors . . . ." (ECF Docket No. 288, ¶ 3) [9] The Court agrees with Warmers and denies the motion for relief from the automatic stay. Although Epic Orange argues that there will be no money "left over" for the bankruptcy estate, Epic Orange's view is at odds with the Trustee's business judgment.

### 3. *Other Arguments*

■ Epic Orange also argues that rejection would not benefit the estate, that rejection would prejudice Epic Orange's rights, that state law prevents rejection of the Epic Orange contract, and that the Epic Orange Contract is actually the "higher and better" offer. (ECF Docket No. 261) The Court's ruling that rejection would benefit the estate is explained fully in Part II, *infra*. Epic Orange is of course incorrect in asserting that state law could

prevent the Trustee from rejecting an executory contract, a right expressly provided in the Bankruptcy Code.

Epic Orange also argues that "the Court has already abstained in this matter by virtue of the fact that the Court granted relief from the automatic stay to [Hudson] so that [Hudson] could foreclose" and that the Trustee was appointed only to investigate the conduct of Boehm and Debtor's former counsel, not to sell the Epic Orange Property. (ECF Docket No. 296, pages 1 and 2) The Court has never made either characterization and rejects the arguments to the contrary.[10]

Finally, in its supplemental objection, Epic Orange argues that the Upstate Properties offer is illusory. At oral argument, the Trustee demonstrated, and Court is persuaded, that Upstate Properties is prepared to close within 48 hours of an order authorizing sale, and that Upstate Properties has the ability to provide sufficient cash or certified funds.

### C. *Boehm's Objections*

■ Boehm describes himself as a director and officer of these Debtors. Boehm filed a personal Chapter 11 case on January 17, 2005. Boehm supports rejection of the Epic Orange contract but opposed the motion to sell the New Windsor Property to Upstate Properties "on the grounds that the notice provided by the Trustee is insufficient and does not adequately market the New Windsor Property." [11] (ECF Docket No. 262, ¶ 4)

---

9. Warmers first objected to relief from the stay partially because it had not been joined in the state court proceeding. Warmers has now been joined in that proceeding but continues to object to Epic Orange's motion for abstention and for relief from the automatic stay.

10. In fact, the relief from the automatic stay was ordered pursuant to a consensual stipulation between the Debtor-in-possession and Hudson. (ECF Docket No. 158)

11. Boehm's objections to service and notice were subsequently withdrawn.

Boehm contends that the New Windsor Property "should be marketed to more than just the creditors of these Chapter 7 debtors," and the Trustee's motion "does not set forth the attempts the Trustee made to market" the New Windsor Property, which Boehm alleges is increasing in value. Boehm urges that the Trustee should "at the very least" offer the property for sale in a local newspaper, if not place it for sale with brokers.

On January 7, 2005, the Trustee's proposed sale to Upstate Properties was noticed upon all creditors and parties appearing in the case and required that higher and better offers be submitted by January 24, 2005. Among the parties receiving notice of the proposed sale and solicitation of competing offers was Aric Valdman, who previously offered $1,450,000 for the New Windsor Property. No competing offers were submitted.

The Trustee responds to Boehm's objection, that it is "unclear from Mr. Boehm's assertions as to what may have changed between June 30, 2004, and the present which would make the [New Windsor Property] marketable at a price higher than the $1,500,000 offered by Upstate Properties." The Trustee also replies that if Boehm's suggestion is taken and a broker retained, the property "would have to sell, rather promptly, for a sum substantially in excess of $1,500,000 to cover the broker's fee" and observes that Upstate Properties "may withdraw its offer at any time and has indicated that it will withdraw its offer if a sale is not promptly authorized." (ECF Docket No. 278, pages 7–8) The Trustee summarizes Boehm's contention that the New Windsor Property should be further marketed as "simply nothing but speculation." Under the circumstances, the Court agrees with the Trustee that the proposed conditions of sale are reasonable. There is no dispute

that the offer from Upstate Properties is $400,000 higher than the purchase price of the Epic Orange Contract. There are no other significant assets in the estate. Rejection of the Epic Orange Contract is currently the only prospect the estate has for any recovery. Upstate Properties is the only valid bidder (other than Epic Orange) after nearly a year in bankruptcy.

## II. Rejection of the Epic Orange Contract

### A. The Epic Orange Contract Is Executory

■ Epic Orange relies on the Countryman Test as to whether or not the Epic Orange Contract is executory. The following discussion (including quotes from Countryman) is from *In re Bradlees Stores, Inc.,* 2001 WL 1112308 at *7 (S.D.N.Y. Sept.20, 2001):

> Under the Countryman Test, a contract is executory **if failure of the parties to perform the obligations remaining due would constitute a material breach of the agreement.** See Countryman at 460. To determine if failure of performance would constitute a material breach, courts look to state contract law. *See In re Riodizio,* 204 B.R. at 421; *In re Streets [& Beard Farm Partnership],* 882 F.2d [233]at 235 [(7th Cir.1989)]. **Under New York law, a material breach is "one which would justify the other party to suspend his own performance, or a breach which is so substantial as to defeat the purpose of the entire transaction."** *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976) (citations omitted); *see also, Katz v. Berisford Int'l PLC,* No. 96 Civ. 8695, 2000 WL 959721, at *3 (S.D.N.Y. July 10, 2000); *Lanvin Inc. v. Colonia, Inc.,* 739 F.Supp. 182, 195 (S.D.N.Y.1990). **The question of whether there has been substantial**

**compliance or material breach is a question of fact.**

(emphasis added).

Even if the only performance required of the Debtor [12] is conveyance of title, such failure would constitute a breach. Moreover, this is *not* the only performance required of the Debtor. Section 6(j) of the Epic Orange Contract requires the Debtor to provide all of the following: (i) Deed, (ii) Sellers Affidavit of Title, (iii) all corporate resolutions, (iv) a certificate of non-foreign status in accordance with Internal Revenue Code § 1445, and (v) "all other instruments as may be reasonably required by [Epic Orange's] legal counsel or the title company." (ECF Docket No. 255, Exhibit B) The Debtor is also obligated pursuant to Section 6(k) to continue to cooperate with Epic Orange "to execute such further assurances as may be reasonably required for the purpose of pursuing the applications [for final subdivision approval and building permits]." *Id.* Failure as to any of these provisions would be a breach of the contract; in fact, Section 6 of the Epic Orange Contract begins: "The obligation of the Purchaser hereunto to close title hereunder shall be conditioned on satisfaction of all of the following or waiver of any term or condition or part thereof by Purchaser." *Id.*

In *In re Sundial Asphalt Co.,* 147 B.R. 72, 83 (E.D.N.Y.1992), Judge Spatt examined several cases and concluded that "[m]ost courts have held that a land sale contract is executory when the debtor-vendor has not yet conveyed or been ordered to convey title." Moreover, "[s]everal other courts have held that a land sale contract which the debtor-vendor sought to reject was executory even when the purchase price due under the contract had

been tendered, but when neither title nor possession had been transferred and no order for specific performance had been entered." *Id.* (citations omitted).

The Epic Orange Contract is executory.

### B. *Epic Orange is Not A Vendee-in-Possession*

Section 365(i) states—

(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

(2) If such purchaser remains in possession—(A) such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and (B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

The text of Section 365(i) does not indicate whether or not Epic Orange can be considered "in possession." Epic Orange argues that it should be considered in possession because it has the right of entry and "frequently entered onto the property for surveys, tests, inspections and studies,

---

12. References to the Debtor mean to the Debtor's estate and the rights that may be exercised on its behalf by the Trustee.

maintains insurance through its agents for its actions with respect to the property and can exercise control of the approval process by application for approvals for uses on the property in its own name which it has done and pursues." (ECF Docket No. 118, ¶ 6) If this is enough to place Epic Orange "in possession," then Epic Orange can elect under Section 365(i) to remain in possession and make all payments due under the contract of sale.

Section 365(i) was designed to protect a purchaser of real property under a long-term land sales contract, in which title does not pass to the purchaser until the full price has been paid. *See* Report of the Commission of the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, Part II, Section 4–602(f)(1) (1973), reprinted in *Collier on Bankruptcy*, App. Pt. 4(c) at 4–729–30 (15th ed. rev.2004); H.R.Rep. No. 95–595 at 349 (1977), reprinted in *Collier on Bankruptcy*, App. Pt. 4(d)(i) at 4–1484. However, "[t]he language of [Section 365(i) ] itself does not require the purchaser in possession be in possession under a particular type of executory contract such as a 'land installment sales contract'. The plain meaning of the statute should be conclusive, except where a literal application will produce a result which conflicts with the intentions of its drafters. This interpretation is consistent with the purpose and intent of the drafters of § 365(i) to protect non-debtors in possession of property where the debtor is the vendor." *In re Maier*, 127 B.R. 325 (Bankr.W.D.N.Y.1991) (citations omitted); see also *McCannon v. Marston*, 679 F.2d 13, 18 (3d Cir.1982) (reference in legislative history to installment contracts "cannot be read as limiting the application of the general language [of Section 365(i) ]").

The bankruptcy court in *In re Summit Land Co.*, 13 B.R. 310, 317–18 (Bankr. D.Utah 1981) examined the legislative history of Section 365(i), including the Commission Report and their working papers.[13] After reviewing these materials, the court found that Section 365(i) normally protects a consumer purchasing a residence under a long-term land sale contract because "[t]he purchaser in this kind of contract is likely to be the buyer of a home or farm or small business who has adjusted to a new location. Very often, especially in the case of a residential buyer, he [or she] will be poor." *Id.* at 317. The court attempted to deduce Congress's meaning of the word "possession" in Section 365(i) and concluded that "[a]llowing the purchaser to remain in possession and to receive title suggests a concern for buyers whose connection with the land is more permanent than ephemeral, more continuous than intermittent, more exclusive than shared, and more personal than delegable." *Id.* at 318. Thus, the legislative history suggested to that court "a concern for buyers whose connection with the land is in fee simple, not fractionated, and is more productive and long term than speculative and short term. Congress intended to prevent the forfeiture of investment gains by the poor rather than to create investment opportunities for the rich." *Id.* at 318. *See also In re Fox*, 83 B.R. 290, 301 (Bankr. E.D.Pa.1988) (Section 365(i) is "directed at preserving the rights of parties in possession of realty, particularly residents, which we believe is a fundamental concern in interpretation of § 365").

Although Epic Orange has the right to file legal proceedings regarding its approval applications (Contract Section 6(f)), Section 6(g) requires, as a condition to Epic

---

**13.** A significant working paper was later published as Lacy, "Land Sale Contracts in Bankruptcy," 21 U.C.L.A. L.Rev. 477 (1973).

Orange closing, that "[t]he Premises shall be **delivered** free and clear of tenancies and occupants." (emphasis added). There is no evidence that the New Windsor Property has been, or was intended to be, "delivered" to Epic Orange prior to closing. This is undeveloped land, and although Epic Orange is in the process of obtaining approval for its development project, there is no evidence of acts of physical possession by Epic Orange, such as improvements to the land.

■ Having concluded that the Epic Orange contract is executory and that Epic Orange is not a vendee in possession, the Trustee can reject the contract provided that the rejection would benefit the estate, a decision that resides with the Trustee in his business judgment.

## C. *The Business Judgment Test*

■ A Chapter 7 trustee is charged with the duty to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest[.]" 11 U.S.C. § 704(1). "As an officer of the Court and as a representative of the Debtor's creditors, the Trustee has a duty to realize the maximum return for the estate for further distribution to the Debtor's creditors." *In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr.N.D.Ohio 1992) (denying trustee's request to substitute a purchaser that would have paid $225,000 less for the same property). "Although a Chapter 7 trustee is a fiduciary obligated to treat all parties fairly, his primary duty is to the estate's unsecured creditors." *In*

*re Poage*, 92 B.R. 659, 662 (Bankr.N.D.Texas 1988); *see also In re Ngan Gung Rest.*, 254 B.R. 566, 570 (Bankr.S.D.N.Y.2000) ("A trustee has the statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors."). "Section 365 of the Bankruptcy Code authorizes the trustee to assume or reject executory contracts, enabling 'the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not.'" *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir.2001) (citation omitted).

■ Long ago, the Second Circuit held in *In re Minges*, 602 F.2d 38, 41 (2d Cir.1979) that "a flexible test for determining when an executory contract may be rejected, however termed (and 'business judgment' is as good a label as any), is most appropriate. For in bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor." The business judgment test emphasizes whether rejection would result in greater benefit for the debtor's creditors. *Id.* at 43. A court "should defer to a debtor's decision that rejection of a contract would be advantageous unless the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim." *In re Sundial Asphalt Co.*, 147 B.R. at 84 (emphasis added) (quoting and adopting *In re Hardie*, 100 B.R. 284 (Bankr.E.D.N.C.1989)).[14]

---

**14.** Judge Spatt distinguished *In re Meehan*, 46 B.R. 96 (Bankr.E.D.N.Y.1985) because *Meehan* was a Chapter 13 case and because "the debtor in *Meehan* was solvent and there was no question that the unsecured creditors would receive 100% of their claims if the contract were assumed." 147 B.R. at 82–83. In *Sundial Asphalt*, there was a "genuine dispute" as to whether rejection was appropriate, and unsecured creditors in that case argued that they would be paid more rapidly by rejection of the executory contract. *Id.*

Judge Gallet used a similar test in *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr.S.D.N.Y.1994): "Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment [in determining to reject an executory contract] will not be altered." Judge Gallet expanded on the court's role in performing this analysis:

> In deciding a motion to assume or reject an executory contract, the bankruptcy court places itself in the position of the trustee or debtor-in-possession and determines whether assumption or rejection of the contract is a reasonable business decision. In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate. However, other courts have also considered a variety of factors in evaluating business judgment, including: (a) whether the contract burdens the estate financially, (b) whether rejection would result in a large claim against the estate, (c) whether the debtor showed real economic benefit resulting from the rejection, and (d) whether upon balancing the equities, rejection will do more harm to the other party to the contract than to the debtor if not rejected.

*Id.* at 758. (emphasis added) (citations omitted).[15] There is no question that—having received an offer in a substantially higher amount for the New Windsor Prop-

erty—the Epic Orange Contract would burden the estate if not rejected. While rejection is not guaranteed to benefit the estate, absent rejection there is no chance whatsoever that unsecured creditors will receive a dividend. The Court sustains as reasonable the Trustee's judgment to reject the Epic Orange Contract so that the New Windsor Property can be sold for a higher dollar amount. The Trustee stated at oral argument that in deciding to reject the Epic Orange Contract, he specifically considered and weighed the possibility that Epic Orange might have a large pre-petition damages claim.[16] The Trustee's decision to acquire funds for administration of the estate and distribution to creditors in exchange for a potentially large pre-petition claim that would share in that distribution is, in the Court's view, a sensible one.

### D. *Other Arguments Against Rejection*

 Epic Orange also argues that the Epic Orange contract "Cannot be Subject to Rejection by the Debtor because Epic Orange, LLC is the Equitable Owner of the Property and Hudson United Bank is the Beneficial Owner of the Proceeds of Sale of the Epic Orange Contract." (ECF Docket No. 122, p. 15 et seq.) As an initial matter, the Court is suspicious of the assertion that: "In New York, courts have held where one has acted upon a contract in good faith, the law will not allow the other party to repudiate it." *Id.* (citing

---

**15.** The Court's ruling is that even under the balancing test advocated by *Sundial Asphalt* and *In re G Survivor Corp.*, the Trustee should be permitted to reject the Epic Orange Contract. It should be noted that many courts do not require a balancing test. In *In re Riodizio*, 204 B.R. 417, 425, n. 9 (Bankr.S.D.N.Y. 1997), Judge Bernstein observed that "some courts refer to a balancing of equities, suggesting that rejection should be refused if it will cause disproportionate harm to the non-debtor party"; Judge Bernstein's view, how-

ever, was that "[t]he right to assume or reject an executory contract is designed to permit the debtor to shed its obligations under burdensome and uneconomical contracts."

**16.** Epic Orange's most recent reckoning of damages includes "actual out of pocket expenses" of $390,197.27. Affidavit of David Weinberg, Exhibit A (ECF Docket Nos. 265 and 271).

*Lowe v. Feldman,* 168 N.Y.S.2d 674 (Sup. Ct.1957)). That may be true outside of bankruptcy, but Section 365 of the Bankruptcy Code specifically allows a debtor to "repudiate" a contract; it is one of the fundamental rights of a trustee in bankruptcy, to be exercised for the benefit of creditors.

Moreover, the assertion that the rule of "equitable conversion" [17] applies whenever a contract for sale of real estate has been formed is stated too broadly. Epic Orange asserts that: "The impact of equitable conversion in the case of Epic Orange and Balco is that upon execution of the sales contract, and Epic Orange making its substantial first payment, Epic Orange became the owner of equitable title in the property, with all the substantial and exclusive rights in the property enjoyed by ... equitable title owners ...." (ECF Docket No. 233, p. 18) In other words, Epic Orange appears to argue that in New York no contract for sale of real estate could be rejected by a Debtor. This ignores several cases in this circuit that do permit rejection of a contract for real estate. *See In re Bradlees Stores,* 194 B.R. 555, n. 1 (Bankr.S.D.N.Y.1996) (BRL); *In re Sundial Asphalt Co., Inc., supra.* It also ignores the analysis in Section 365(i)(1), which begins: "If the trustee rejects an executory contract of the debtor for the sale of real property ..." Thus, Section 365 specifically contemplates that executory contracts for the sale of real property can normally be rejected unless the purchaser is in possession. Section 365 could have been drafted to state that contracts for sale of real estate cannot be rejected where state law would not permit it under, *e.g.,* a theory of equitable conversion; but this is not what Section 365 says. Furthermore, a 1956 district court decision

rejected the arguments made by Epic Orange:

> [W]hatever rights the vendee might have acquired under New York law as an equitable owner of the property, absent an instrument of conveyance, were subject to the right of the trustee to reject or assume executory contracts so as to achieve the overriding purpose of the bankruptcy law to secure an equitable distribution of the assets of the bankrupt. **The vendee's equitable title, so long as it remained such, was subject in the event of the vendor's bankruptcy before delivery of the deed to the statutory power of rejection by the trustee.** No logical reason exists why a trustee should be free to divest himself of an onerous contract of personalty and yet be compelled to carry the burdens of an undesirable realty contract.

*In re New York Investors Mut. Group, Inc.,* 143 F.Supp. 51, 54 (S.D.N.Y.1956) (footnotes omitted) (emphasis added).

### CONCLUSION

Consistent with this decision, the Court will enter separate orders (1) authorizing the sale of the New Windsor Property, with the provision that the proceeds of sale will be held in escrow pending the outcome of the Warmers Adversary Proceeding, (2) denying the motions by Epic Orange to abstain, and for relief from the automatic stay, and (3) granting the Trustee's motion to reject the Epic Orange Contract.

---

**17.** *In re Estate of Guterman,* 125 Misc.2d 59, 476 N.Y.S.2d 1006 (N.Y.Surr.1984), cited by Epic Orange, applied Florida law on equitable conversion.